OPINION OF THE COURT
Wachtler, J.
Two related search and seizure questions are presented by this appeal. First, whether the use of a dirty rental car in the City of New York establishes reasonable suspicion, as a matter of law, that the occupants are engaged in criminal activity. Second, whether the police officers’ actions in approaching the parked car, asking the driver for his license and registration and further ordering the three occupants to remain in the vehicle constituted such a minor intrusion on constitutional rights that the police may do so absent reasonable suspicion. The trial court held for the defendants on both points and suppressed the evidence seized from the car. The Appellate Division affirmed, with one dissent. The prosecutor appeals.
On January 4, 1979 two New York City police officers, Stahl and Dillon, were on patrol in an unmarked car in *473 Queens County. Dillon was driving and Stahl was acting as “recorder” in the passenger seat. Both officers were in plain clothes. At approximately 1:00 a.m. Officer Stahl, the only witness for the prosecution to testify at the hearing, observed a 1978 Chrysler Cordoba carrying three black men pass in the right lane. The officer could tell from the license plate that it was a rental car, and noted that it was extremely dirty. The police followed the car for three to five blocks until it parked near an open bar. Officer Stahl told his partner to pull up next to the car, and then park behind it. The officer conceded at the hearing that up to that point he had not observed the defendants violate any law and that his interest was aroused solely by the fact that the men were riding in a dirty rental car.[1]
After parking behind the defendants the officers left their car and walked toward the other vehicle. As Officer Stahl approached he noticed that it was a two-door sedan; that the defendant Cabey was in the driver’s seat; that another man, Gilbert Williams, was sitting in a slumped position in the rear seat; and that the defendant Harrison had opened the door and was proceeding to get out of the car. Stahl immediately told Harrison to get back in the car. He also told Williams to sit up. Both men complied with these directions. Officer Dillon then stationed himself beside the passenger door while Stahl crossed to the driver’s side, identified himself as a police officer and told Cabey to produce his license and registration.
*474 Cabey told the officer that he did not have his license and that Harrison had the registration papers. While Harrison looked for those papers Officer Stahl returned to the police car and checked to see if the rental car had been reported stolen. He was informed that it was not but that it had been listed as an impounded vehicle. While Stahl attempted to determine what that meant he looked through the briefing notes he had taken at the beginning of his tour and found that approximately 24 hours ago three men roughly fitting the description of the defendants and Williams had committed an armed robbery in the area and had fled in a “new” bluish green Cordoba, similar in color to the defendants’ vehicle.
As Officer Stahl walked back toward the defendants’ car he noticed that the defendant Harrison was lifting up his head from a crouched position. When the officer pointed his flashlight into the car at the floor in front of Harrison he saw a .22 caliber revolver. Stahl then drew his gun and informed his partner of the gun. During the subsequent search of the car and its occupants the officers found two more handguns and ammunition.
At the station house Harrison was able to produce a registration for the vehicle and a receipt showing that the vehicle was no longer impounded and thus, as the officer conceded at the hearing “was properly in his possession”. The defendants, however, were charged and subsequently indicted for unlawful possession of the weapons.[2]
As noted the trial court granted the defendants’ motion to suppress the evidence seized from the vehicle. The court held that Officer Stahl’s actions in ordering the occupants to remain in the vehicle “constituted more than the minimal intrusion of requesting information” and could not be justified “in the absence of any indication of criminal activity”. The court also held that when the officer gave the *475 order he was relying solely on the fact that the three men were occupying a dirty rental car, which the court found was insufficient to provide the requisite reasonable suspicion that “criminal activity was afoot”.
The Appellate Division affirmed agreeing that reasonable suspicion was the appropriate standard and that the facts did not establish reasonable suspicion. One Justice dissented, agreeing essentially with the prosecutor’s position.
At the outset we observe that, in view of the factual findings made below, this case does not deal with the powers of the police to stop a vehicle. Here the defendants had voluntarily stopped the vehicle and parked it before the police approached. The prosecutor notes that under our decision in People v De Bour (40 NY2d 210) a police officer does not need reasonable suspicion to approach an individual for information. All that is required is an articulable basis, which in this case was supplied by the extremely dirty condition of the defendants’ rental car. The prosecutor further contends that once the officers had the right to approach the car they could reasonably direct the occupants to remain in the car because this reduces the potential danger to the police and is “an extremely minor intrusion on the defendants’ rights”. It is urged that this is comparable to police officers ordering defendants out of a car to protect themselves which, the prosecutor contends, was recently held constitutional in Pennsylvania v Mimms (434 US 106). The prosecutor also contends that the courts below erred in finding the facts insufficient in this case because our recent decision in People v Roman (53 NY2d 39) stands for the proposition that “the initial stop” can be justified “on the basis of the unusual condition of the defendant’s rented car”.
The prosecutor’s primary argument overlooks the basis for our holding in De Bour. In that case we observed (at p 223) that “the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and atten *476 dant factors increase in weight and. competence”. Thus when we held in that case that a police officer did not need reasonable suspicion to approach a citizen for further information we did so only because we recognized that such an inquiry involved a minimal intrusion that was not equivalent to a stop in which the individual’s freedom of movement is significantly interrupted (see People v De Bour, supra, at pp 216, 223). It should be evident from our holding in that and subsequent decisions that if the police escalate the encounter as they did here by exercising restraint over the individual as opposed to his vehicle, even out of concern for their safety, a more substantial predicate is required. In other words, before the police can forcibly or constructively stop an individual as was done here by the order to remain in the car there must be some articulable facts, which initially or during the course of the encounter, establish reasonable suspicion that the person is involved in criminal acts or poses some danger to the officers (People v De Bour, supra, at p 216; People v Carrasquillo, 54 NY2d 248, 252). Under the prosecutor’s analysis reasonable suspicion would never be required because every stop begins with a police officer approaching an individual for information — a situation in which there is at least an unfounded risk to the officer’s safety.
Neither is there any merit to the argument that prohibiting the occupants from leaving the automobile is such a minor intrusion on their rights that the police may do so absent reasonable suspicion. Confining the occupants to the car, even temporarily, is at least equivalent to a stop. A temporary stop is of course less intrusive than an arrest and thus does not require probable cause (see, e.g., Terry v Ohio, 392 US 1; People v DeBour, supra; see, also, People v Ingle, 36 NY2d 413; Delaware v Prouse, 440 US 648). However a stop is nevertheless a limited seizure of the person which at least requires reasonable suspicion (Terry v Ohio, supra; People v De Bour, supra; see, also, CPL 140.50, subd 1). The Supreme Court’s decision in Pennsylvania v Mimms (434 US 106, supra) does not, as the prosecutor suggests, represent a departure from that requirement in cases involving police encounters with those using the public highways.
*477 The key fact in the Mimms decision is that the driver had been lawfully stopped for a traffic offense. The court noted (at p 111) that the police had “already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver’s seat of his car or standing alongside it”. The court concluded that out of a concern for his own safety the police officer could order the driver out of the vehicle because under the circumstances (at p 109) “the incremental intrusion resulting from the request to get out of the car” once the driver had been lawfully stopped “can only be described as de minimis”. The court did not hold that the police could take similar action when, as in the case now before us, the driver had not been lawfully stopped for a violation of the law. Indeed the court expressly noted (at p 111, n 6) that “we do not hold today that ‘whenever an officer has an occasion to speak with the driver of a vehicle, he may also order the driver out of the car’. We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment’s proscription of unreasonable searches and seizures”.
In sum, the courts below were correct in their conclusion that the police officers’ actions were unjustified in the absence of reasonable suspicion.
The courts’ further holding that reasonable suspicion was lacking in this case involves a mixed question of law and fact which is beyond the review powers of this court if the evidence at the hearing supported the determination made by the lower courts (see, e.g., People v Wharton, 46 NY2d 924, 925; People v Clements, 37 NY2d 675, 677-678; People v Oden, 36 NY2d 382, 384-385). The rule applies “where the facts are disputed, where credibility is at issue or where reasonable minds may differ as to the inference to be drawn” (People v McRay, 51 NY2d 594, 601). The dissenter’s contention with respect to inferences was specifically rejected in People v Alexander (37 NY2d 202; see, also, People v Morales, 42 NY2d 129, 137-138). The rule, it should be noted is not an oddity employed only in a limited category of cases. It is a basic principle which has been *478 broadly applied to a wide variety of issues including, for instance, whether a defendant consented to questioning (People v Morales, supra), whether the police exercised due diligence in attempting to locate an informer (People v Budd, 46 NY2d 930), whether there was custodial interrogation (People v Williamson, 51 NY2d 801), whether a room was exclusively in the defendant’s control (People v Minori, 51 NY2d 930, 931), whether there was consent to search (People v Meredith, 49 NY2d 1038), whether there was an intent to abandon property (People v Hogya, 56 NY2d 602), and of course whether there was probable or reasonable cause for a search (People v Alexander, supra; People v Wharton, supra; People v Rizzo, 40 NY2d 425 [noting that the rule applies to findings that probable cause did not exist as well as findings that there was probable cause]). The application of the rule in search and seizure cases especially accords with the general principle long recognized in civil cases that questions of the reasonableness of conduct can rarely be resolved as a matter of law even when the facts are not in dispute (see, e.g., Andre v Pomeroy, 35 NY2d 361).[3]
In the case now before us there is no basis for setting aside the finding of the courts below that the defendants’ use of a dirty rental car in the City of New York did not establish reasonable suspicion that they were involved in criminal conduct. Contrary to the dissenter’s view it is not common knowledge that ordinarily rental cars are relatively clean and well maintained. Rental companies may rent their cars in that condition but their customers are not always so fastidious. The cars are often rented to individual customers for weeks or months at a time and it is not always possible, even for concerned customers, to maintain the cars in their original condition, particularly in large metropolitan areas. Thus if the defendants’ use of a dirty rental car in the City of New York could give rise to reasonable suspicion, that certainly was not the only infer *479 ence that could be drawn. Because reasonable minds could differ as to the inferences and thus as to whether the police action was justified, further review by this court is precluded (People v Wharton, 46 NY2d 924, supra).
Our holding in People v Roman (53 NY2d 39, supra) is not to the contrary. In that case the defendant was stopped after he was found to be driving a dirty rental vehicle, with extensive damage, in an area known as a dumping ground for cars. Under those circumstances the lower courts held that there was reasonable suspicion of criminality and we deferred to their determination. The case simply illustrates the general rule that questions of reasonableness “must necessarily turn on the facts in each individual case” (People v Green, 35 NY2d 193, 195; People v Prochilo, 41 NY2d 759, 761) and that the determination of the lower courts on such points is not to be set aside if it is supported by the record. The case, does not stand for the proposition that the use of a dirty rental car establishes reasonable suspicion as a matter of law, or that the police are always justified in approaching the occupants for information and prohibiting them from leaving a car whenever the car bears rental plates and is apparently in need of cleaning.
Accordingly, the order of the Appellate Division should be affirmed.

. The officer also testified at the hearing that the rear license plate appeared to be hanging at an angle. On cross-examination, however, he conceded that he had not made any reference to this in his reports or notes or in his prior testimony at the preliminary hearing. The defendant testified that the license plate was located in a recessed compartment above the rear bumper which protruded approximately five inches beyond the point where the license plate rested. He stated that the plate covered the gas tank and when he filled the tank several hours prior to his arrest he observed the plate was properly attached. He also introduced in evidence a photograph of a 1978 Cordoba showing the rear license plate positioned in this manner. In its decision the trial court stated that the condition of the plate had “not been considered by the court in determining the reasonableness of the police conduct as based on Officer Stahl’s testimony, the court concludes that the plate did not cause the initial pursuit or subsequent questioning of the defendants”. The Appellate Division agreed with that finding. Although the People urge that these findings are based on a misunderstanding of the officer’s testimony, we, of course, are bound by the factual determinations, particularly in view of the clear credibility question presented at the hearing (see, e.g., People v Zimbardo, 21 NY2d 15).

. The record is not clear as to why the vehicle had been impounded, but it appears that it is related to a seizure of the car by the city in connection with a traffic or parking violation. It is conceded that the car had been released to the defendant some time prior to his arrest, and that the police records had not been updated to reflect this.
There is no indication in the record that the defendants were charged with the robbery which occurred a day or two prior to their arrest.

. The dissent has characterized this as a self-imposed rule, which of course is often true of judicial precedents. To the extent it is meant to suggest that the rule is somehow less binding than legislative pronouncements, the observation misconceives the nature of the judicial process. Judges, too, are expected to follow the law, even when they have played a part in fashioning the rule.