■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DESMOND COKER, Appellant.—Judgment of the Supreme Court, New York County (Allen Alpert, J.), rendered on October 1, 1986, convicting defendant, upon his plea of guilty, of attempted criminal possession of a weapon in the third degree, and sentencing him to five years' probation, is unanimously reversed on the law and the facts, the motion to suppress granted and the indictment dismissed.

At approximately 6:10 P.M. on January 13, 1986, Officer John Saager, wearing plain clothes and riding in an unmarked car, overheard a radio message derived from an anonymous tip concerning a "suspicious" black man wearing a beige coat and boots outside of the movie "Krushgroove". According to Officer Saager's testimony at the pretrial hearing, this man was reportedly in possession of a gun and was going to shoot two people, but, in his memo book, he described the call as "respond to radio run of male black with beige jacket boot and gun." Officer Saager and his partner thereupon drove to 45th Street and Broadway in Manhattan, where the film was being shown. When they arrived at that location, they noticed that two marked patrol cars were already parked directly in front of the theater on the east side of Seventh Avenue and that uniformed officers were walking around amidst the crowd outside the theater.

The officers parked across Broadway on the west side. They

spotted a black man, defendant herein, wearing a beige coat and tan "weave-type" shoes. This man was seen to be somewhat south of the theater rather than in front of it. He was walking in a northwesterly direction and across Broadway and purportedly looking back over his shoulder toward the crowd and activity in front of the theater. Defendant proceeded past the police officers seated in their unmarked car and entered the Barnes and Noble bookstore in front of which their vehicle was parked. Once inside the store, he stood in front of a window chatting with the security guard, and both of them glanced out towards the patrol cars for some 3 to 4 minutes. The marked patrol cars then left the scene, having radioed that the original message was "unfounded", a message heard by Officer Saager and his partner. Defendant contends, and the People do not dispute, that the Police Department's Communications Division Radio Code Signals 1985 Guide states that the designation "unfounded" is "used when an incident that was reported, or a closely related incident, never happened and the report is untrue."

Immediately after the departure of the patrol cars, defendant emerged from the bookstore in the company of a young black woman and started heading northward with her. Officer Saager and his partner got out of their automobile, and, when defendant was about 30 to 40 feet away from the bookstore, they grabbed him by the arms from behind, identified themselves as police officers and pushed him up against a wall. They subsequently conducted a pat-down search of defendant, pursuant to which they recovered a clip with bullets and a gun, both found in an inside pocket. In response to a question from the officers about the weapon, defendant stated that he had obtained it for his protection since he had recently been robbed. An ensuing search of the woman failed to reveal anything, and she was released.

Defendant later moved to suppress the physical evidence seized from him, which motion was denied following a hearing held in connection with the matter. The court's determination was in error; the motion to suppress should have been granted and the indictment dismissed. The law is well established that a radio report arising from an anonymous source and consisting of a generalized description and specifying a location of a "man with a gun" does not, without more, constitute the reasonable suspicion necessary to stop and frisk anyone who might happen to fit that description (*People v Bond,* 116 AD2d 28, 31; *see also, People v Benjamin,* 51 NY2d 267; *People v Stewart,* 41 NY2d 65; *People v Maldonado,* 119 AD2d 502). This is particularly the situation where, as in the instant case,

the description contained in the message does not indicate that the individual in question is dressed in an unusual manner *(People v Vincente,* 100 AD2d 789, *affd* 63 NY2d 745; *People v Maldonado, supra).* Not only was the description here sufficiently imprecise so as to be able to apply to any number of people *(see, People v La Pene,* 40 NY2d 210; *People v Maldonado, supra),* but the information received by the police "did not give such a unique description of the suspect and his acts so as to render it inherently trustworthy and reliable" *(People v Bond, supra,* at 31).

Even assuming that the radio transmission at issue here may have provided a sufficient predicate upon which to make an initial noncustodial inquiry *(People v Landy,* 59 NY2d 369; *People v Harrison,* 57 NY2d 470; *People v Benjamin,* 51 NY2d 267; *People v De Bour,* 40 NY2d 210), defendant was seized without any sort of inquiry whatever. He did not attempt to flee; he did not make any threatening movements or gestures, nor did the officers observe any suspicious bulges on his person. Even more significant, as vague as was the information provided, defendant did not even match it; he certainly did not possess the type of footwear set forth in the radio run, since he had on casual low shoes rather than boots. In addition, defendant was never observed in front of the theater but further down the street. It, thus, appears that the only basis for the stop and frisk which occurred here was that he was a black man wearing a beige coat, hardly a unique form of dress, who happened to be in the general vicinity of the place mentioned in the message and was glancing in the direction of the commotion on the street, a normal human reaction in the face of a visible police presence. Consequently, the police action in question here was entirely arbitrary and unsupported by the requisite reasonable suspicion. Concur— Sullivan, J. P., Ross, Milonas and Rosenberger, JJ.