[614 NYS2d 506]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSE OCASIO, Appellant.

First Department, July 7, 1994

APPEARANCES OF COUNSEL

*Daniel Hsiung* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Polly Greenberg* of counsel *(Robert M. Raciti* with her on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

**OPINION OF THE COURT**

CARRO, J.

On January 7, 1990, Police Officers James Meehan and Joseph Falcone were part of a tactical narcotics team assigned to observe buildings at 235-241 Henry Street in Manhattan. Officer Meehan was in an unmarked police van parked opposite 235 Henry Street, a building known as a heavy drug-selling location, while Officer Falcone and Detective Christine Bella were parked in an unmarked car about half a block away on Montgomery Street. At about 7:30 P.M., a white Camaro driven by defendant pulled up in front of the building. Codefendant Joseph Torres left the car, stood on the stoop, and looked up and down the street as defendant parked. When defendant finished parking, he joined Torres on the stoop and both men looked up and down the street for 10 or 15 seconds before entering the building.

Officer Meehan believed the two men were looking out for police and this, coupled with their entering a heavy drug traffic location, led him to suspect that defendant and Torres were involved in criminal activity. Officer Meehan radioed Officer Falcone and Detective Bella with a description of the two men and their car, and relayed his suspicion that they were "up to something." Two or three minutes later Officer Meehan saw defendant and Torres "exit the building, trotting. They weren't running, but they were walking very fast." Defendant got into the driver's seat of the Camaro, Torres entered the passenger side, and the car pulled away. Officer Meehan radioed a second transmission to Officer Falcone and the rest of the backup team informing them that the two men were leaving and describing the route they were taking.

Moments after receiving Officer Meehan's radio transmis-

sion, Officer Falcone saw defendant's Camaro turn onto Montgomery Street. Accompanied by his partner, Detective Bella, Officer Falcone followed defendant and Torres in his unmarked car. When the Camaro stopped at a red light, Officer Falcone stopped his car behind the Camaro, without activating his blinking lights or siren. Officer Falcone and Detective Bella then exited their car and approached the Camaro, Falcone going to the passenger side and Bella to the driver's side. Officer Falcone drew his gun when he approached the car, but held it out of sight behind his right leg. Officer Falcone walked to the passenger side window, where Torres sat, and displayed his badge. When Torres rolled down his window, Officer Falcone asked, "[h]ow you doing, can I see your identification?" Torres asked what was wrong and Officer Falcone replied, "Nothing. I want to see your identification." Torres then handed the officer a wallet. When Officer Falcone opened it, he found a New Jersey driver's license in the name of "Seng Ong," with a picture of an Asian man who did not resemble Torres on the license. The wallet also contained two credit cards and a realtor's identification card in Mr. Ong's name.

Officer Falcone asked Torres where he had gotten the wallet, and Torres replied, "Listen, I just got the wallet from somebody. I was going to sell the cards, and everything inside." When asked from whom he had gotten the wallet, Torres replied, "I can't tell you." At this point, Officer Falcone holstered his gun and both defendants were taken to the back of the car. Officer Falcone did not know if Detective Bella's gun was unholstered, but when she came to the back of the car he did not see a gun in her hand.

After Torres's statements, the officers asked defendant and Torres to accompany them to the precinct, and both men agreed to do so. Officer Falcone explained that he would have to pat them down, to which defendant and Torres consented. While patting down Torres, Officer Falcone discovered Seng Ong's checkbook in Torres's back pocket. At the precinct, Officer Falcone spoke on the telephone with Mr. Ong, who reported that he had been robbed of six dollars at gunpoint just 10 minutes earlier as he entered his apartment building at 235 Henry Street. At about the same time, Officer Meehan returned to the precinct and identified defendant and Torres as the two men who had entered 235 Henry Street minutes earlier. Defendant and Torres were then informed that they were under arrest. Officer Falcone conducted an inventory

search of the Camaro and discovered six dollars in the driver's side sun visor and a fully loaded .357 magnum revolver on the floor. Defendant presented no evidence at the hearing.

Justice Uviller credited both officers' testimony, made findings of fact as summarized above, and made the following conclusions of law:

"The officers' conduct was proportionate to the facts available to them as events unfolded. Officer Falcone's approach to defendants' car, already stopped at a red light, did not constitute a stop or seizure, but merely an exercise of the officer's right to request information (cf., *People v Harrison,* 57 NY2d 470; *People v Brown,* 112 AD2d 945). As such, it required only an articulable reason to approach, which was predicated here on the transmission received from Officer Meehan: defendants had been · observed pulling up to a known drug location, appearing to be looking out for police by scanning the street before entering the building, emerging hastily (whether running or walking rapidly) after only a minute or two and driving away. Indeed, had defendants not already been stopped at the red light, the police would have been justified in briefly detaining them for inquiry based upon a reasonable suspicion that they had just purchased drugs or that other criminal activity was afoot. In any event, Officer Falcone's initial intrusion was minimal; he asked for identification from an occupant of the car which was stopped at a light; the officer's unholstered gun was concealed from view and there was no show of force; defendant remained seated in the car.

"When defendant Torres, in response to Officer Falcone's request for identification, handed over a wallet patently not his, the officer's suspicion was reasonably augmented, warranting further investigatory detention. * * * Torres' response [to Officer Falcone's inquiry] that he had 'just' obtained the wallet, his refusal to say from whom, and his intent to sell the contents, taken together with the defendants' actions at 235 Henry Street, constituted probable cause to arrest both defendants. The circumstances provided a reasonable basis for believing that both defendants had just stolen the wallet or were in joint criminal possession of stolen property.

"Assuming, *arguendo,* that at this point there was not yet probable cause to arrest, the facts warranted the continuing and limited investigative detention entailed in transporting defendants a few blocks to the precinct in order to contact Mr. Ong. *People v Hicks,* 68 NY2d 234. The frisk of Torres before

placing him in the squad car revealing Mr. Ong's checkbook was appropriate police procedure."

Our primary focus on this appeal is on the propriety of the officers' initial approach to the defendant's vehicle. In *People v De Bour* (40 NY2d 210, 213) the Court of Appeals held that "[t]he basis for [an informational] inquiry need not rest on any indication of criminal activity on the part of the person of whom the inquiry is made but there must be some articulable reason sufficient to justify the police action which was undertaken." An informational approach was held proper in that case based upon the defendant's crossing the street to avoid walking past uniformed police officers after midnight in an area known for its high incidence of drug activity (40 NY2d, *supra*, at 220). In *People v Hollman* (79 NY2d 181) an informational approach was held permissible when the defendant appeared nervous, repeatedly scanned the bus terminal, and hesitated when he made eye contact with a police officer. Other circumstances held to constitute an articulable basis sufficient to support an informational approach include a defendant's striking an automatic train ticket issuing machine with his fist *(People v Alston,* 189 AD2d 555, *lv denied* 81 NY2d 881) and "the extremely dirty condition of the defendants' rental car" *(People v Harrison,* 57 NY2d 470, 475, *supra).*

*People v De Bour* "also stands for the proposition that the brevity of the encounter and the absence of harassment or intimidation will be relevant in determining whether a police-initiated encounter is a mere request for information" *(People v Hollman, supra,* at 190). Here, the police did not utilize turret lights or siren or an order by loudspeaker to pull the car over *(compare, People v May,* 81 NY2d 725; *People v Sobotker,* 43 NY2d 559), and defendant and Torres were not ordered to remain in the vehicle *(compare, People v Harrison, supra).* Rather, the officers approached the defendant's car while it was already stopped for a traffic light; thus there was no "stop" of the defendant or his car. Although Officer Falcone had drawn his gun upon approaching the car, Justice Uviller questioned him about the placement of his gun and even asked him to demonstrate how he held it. With the benefit of this demonstration Justice Uviller found that "the officer's unholstered gun was concealed from view and there was no show of force." This Court has recently observed with respect to a similar factual circumstance that "[t]he fact that the officer had drawn and concealed his gun did not make the

inquiry impermissibly coercive because there was no evidence that defendant saw the gun" *(People v France,* 197 AD2d 483, *lv denied* 82 NY2d 894). Thus, defendant's primary argument that he and Torres were "seized" when the two officers "surrounded the car, with Falcone approaching the passenger side with a drawn gun and Bella approaching the driver's side," is ultimately not persuasive.

Defendant also argues that in determining whether there was a seizure of the defendant's car a critical factor is whether the car's motor was running, and cites, in support, *People v. Allende* (39 NY2d 474). In that case police officers approached the defendant's car with guns drawn as it stood double parked with the motor running, and ordered the occupants out of the car, whereupon a gun was observed in the car. In ordering the gun suppressed, the Court of Appeals emphasized that the police had received no information relating to the vehicle or its occupants, that there was not "even an iota" of evidence upon which to posit any possible finding that the facts available to the police would warrant a reasonably held belief that the action taken was appropriate *(People v Allende, supra,* at 477, citing *Terry v Ohio,* 392 US 1, 21-22), and concluded that the seizure was based on nothing but a mere " 'whim or caprice' " *(People v Allende,* 39 NY2d, *supra,* at 477). Here, in contrast to *Allende,* the officers had received a radio transmission respecting the defendant's car and its occupants sufficient, as the hearing court found, to satisfy the articulable basis test for an informational approach without any show of force limiting the defendant's freedom of movement.

The defendant's primary argument, it may be noted, is essentially indistinguishable from the analysis contained in Judge Fuschberg's dissenting opinion in *People v De Bour* (40 NY2d, *supra,* at 231), and it therefore does not represent an accurate statement of the law governing the facts herein. Rather, our "inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence. The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality" *(People v De Bour,* 40 NY2d, *supra,* at 223). Here, the intrusion was indeed minimal, and only information, Torres's identification,

was requested. If Torres and the defendant had provided their own identification and had been allowed to proceed on their way, and Mr. Ong had later reported the robbery, the police at least would have had a lead as to the robbers' identity. That is one of the appropriate purposes of an informational approach, which was based here upon an articulable reason, although not necessarily indicative of criminality. In sum, we agree with the hearing court's legal analysis of the events as they unfolded, except that we decline to address the court's dictum that if the defendants had not already been stopped at the red light the police could have briefly detained them upon a founded suspicion that criminal activity was afoot.

Accordingly, the judgment of the Supreme Court, New York County (Rena K. Uviller, J.), rendered December 13, 1990, convicting defendant, upon his plea of guilty, of attempted robbery in the first degree, and sentencing him, as a persistent violent felony offender, to an indeterminate term of eight years to life imprisonment, should be affirmed.

MURPHY, P. J. (dissenting). I would reverse the judgment and dismiss the indictment. The suppression motion should have been granted.

The majority holds that pursuant to the common-law right to request information, police may detain the occupants of a motor vehicle for questioning while that vehicle is stopped for a red light, based on only an "articulable reason," the lowest of the four levels enunciated in *People v De Bour* (40 NY2d 210, 213, 223). The majority thus equates the limited intrusion of *De Bour*, asking a person on the sidewalk what he is doing in the neighborhood, with the substantial interference of detaining a vehicle to question its occupants. This is not the law in New York; nor should it be *(see, People v May*, 81 NY2d 725).

Even under the next level of intrusiveness, which requires a founded suspicion that criminal activity is afoot, the Court of Appeals has held that "[t]he common-law power to inquire does not include the right to unlawfully seize" *(People v Cantor*, 36 NY2d 106, 114).

Here there was no founded suspicion that criminal activity was afoot. Looking up and down the street before entering a building does not form a basis for such a founded suspicion *(see, People v Hollman*, 79 NY2d 181; *People v Sobotker*, 43 NY2d 559).

The testimony at the suppression hearing established that

at 7:30 P.M., Police Officer Meehan, while working undercover as part of a tactical narcotics team, was parked in an unmarked van across from 235 Henry Street, in Manhattan, which is characterized as a heavy narcotics traffic location. Officer Meehan testified that he "got a little suspicious" when he saw appellant, Jose Ocasio, and a companion, Joseph Torres, stop and park a white Camaro. He made his first radio transmission, describing the car and occupants, to other members of his "buy and bust" team right after appellant parked the car and Torres got out. According to Meehan his suspicion was aroused by "the way they stopped the car * * * the way he was looking for police officers, or whatever." He made his second radio bulletin after Ocasio and Torres stopped on the stoop of 235 Henry Street and looked up and down the street for 10 or 15 seconds, went into the building, and returned two or three minutes later, walking quickly, and drove away.

Responding to the radio bulletin, an unmarked police car followed appellant. When appellant stopped for a red light, two police officers approached both sides of the vehicle with their pistols drawn but not raised. Officer Falcone, who testified at the suppression hearing, walked up to the passenger side, tapped on the window, displayed his badge, and asked for identification. Detective Bella, the other police officer in the cruiser, "did the same on the other side." Detective Bella did not testify. After Torres, the passenger in appellant's car, gave Officer Falcone a wallet that clearly did not belong to him and explained that he intended to sell the contents, the confrontation escalated, backup police officers arrived, and appellant and his companion were ordered out of the car.

The majority holds that the information contained in the radio bulletins by Officer Meehan constitutes a sufficient articulable reason to justify what they characterize as an "informational approach," relying upon *People v De Bour (supra)*, *People v Hollman (supra)*, and *People v Harrison* (57 NY2d 470). According to Officer Falcone, the radio bulletin contained only a description of the vehicle and its occupants and "that he wanted me to stop that vehicle." The majority also holds that there was no seizure of the vehicle, only "an informational approach."

The majority distinguishes *People v Allende* (39 NY2d 474), which held that police officers could not approach a double-parked car and order the occupants out based on a suspicion

that the car might be stolen, on the ground that the police officers here were acting on the basis of a police radio bulletin. But the radio bulletin was based on nothing more than the observation that appellant and his companion were "looking up and down the street." It is a mere hunch and is insufficient as a matter of law to support the seizure of appellant's vehicle. To elevate the radio bulletin to support anything more than the minimal intrusion of a right to request information would be "sheer bootstrap" *(People v De Bour, supra,* at 215; *People v Forelli,* 58 AD2d 76).

The majority holds that the detention of the vehicle at the red light with its engine running was not a seizure. I disagree. There can be no serious question that appellant was "physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action" *(People v Cantor, supra,* at 111; *see also, People v De Bour, supra,* at 216). Officer Falcone acknowledged that the occupants were not free to go, and testified: "I was going to detain that vehicle." There is a big difference between a police approach of a car that has parked voluntarily *(see, People v Allende, supra; People v May, supra)* and this case where the vehicle was underway but had lawfully stopped for a traffic light. The test is whether a reasonable person would have believed that the officers' conduct here constituted a significant limitation on his or her freedom *(see, People v Bora,* 83 NY2d 531). Appellant's liberty was unquestionably interrupted as a result of his submission to the " 'authority of the badge' " *(supra,* at 535, quoting *People v Cantor, supra,* at 111).

There can be no legitimate dispute that the vehicle was "seized" for constitutional purposes. By labeling it an "informational approach," the majority has stepped into "the semantic trap of labeling the police action" *(People v Cantor, supra,* at 112). No semantic exercise can obfuscate the ineluctable circumstance that the police seized the vehicle without sufficient knowledge of ongoing or imminent criminality. The seizure was unreasonable as a matter of law.

ELLERIN and KUPFERMAN, JJ., concur with CARRO, J.; MURPHY, P. J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered December 13, 1990, affirmed.