OPINION OF THE COURT
John M. Leventhal, J.
Defendant Terrence Smoot is charged with the intentional murder of one Thomas Singletary. Defendant Smoot was granted a combined Dunaway-Huntley-Wade hearing which was conducted by the court. The People called four witnesses: Detective Paul Capellini, Detective Thomas Deutsch, Detective Raymond Anderson, and Kevin Fields. The defense called no witnesses. Based upon the credible testimony of record, the court makes the following findings:
*864 FINDINGS OF FACT
On October 29, 1994 at approximately 4:00 p.m., Thomas Singletary was shot and killed during a dispute at a dice game in the lobby of 108 Kingsborough Third Walk in Kings County.
Two participants in the dice game, Michael Woolerey and Selwin Foster, were separately shown one six-person photo array at 11:50 p.m. on October 29, 1994 and 12:35 a.m. October 30, 1994 respectively. Only the front and profile of each person’s head was displayed in the array. Michael Woolerey picked out defendant’s picture and commented, "That’s the guy who killed my man Biz”. Foster, who withdrew from the dice game prior to the shooting, picked out the defendant’s picture as a participant in the game and referred to him as "Smooth”, whom he knew from hanging out in the "projects”. The picture of the defendant was one taken during a prior arrest that resulted in the charges being dismissed.
Kevin Fields knew the defendant since they were both about 13 or 14 years old in junior high school. For years they saw each other five to seven days a week. They were close friends, knew each other’s family and had been in each other’s houses on many occasions. Fields indicated to the police that the defendant lived in the 1400’s at St. Marks Avenue in Brooklyn. He also stated that Terrence Smoot was known as "Smooth” in the neighborhood.
Approximately three surveillance sites were observed on a few dates between October 29 and December 24, 1994. Defendant’s residence at 1434 St. Marks Avenue and defendant’s girlfriend’s residence believed to be at 341 Kingsborough Third Walk were two of the premises observed. On December 24, 1994, at 7:00 a.m., a surveillance site was set at 395 Nostrand Avenue based on an anonymous call that the defendant was staying with his named girlfriend at that location. The police were looking for a Terrence Smoot or "Smooth” described as a male black, 5 feet 8 inches and 140 pounds. In addition, the members of the surveillance team had viewed a photo of Terrence Smoot.
At approximately 1:20 p.m. on December 24, 1994, one member of the plain-clothes surveillance team, Detective Lieutenant Luis Gonzalez, radioed a transmission that he had observed a male black wearing a tan colored snorkel coat with the hood pulled tightly across his face exiting 395 Nostrand Avenue. The subject then almost immediately returned inside that location. Ten minutes later a male fitting the description given by Lieutenant Gonzalez exited the subject premises and went to a telephone booth across the . street at the corner of Nostrand and Putnam Avenues. The detectives’ suspicions *865 were aroused at the manner in which the hood was closed as it was a particularly warm day for late December. Detective Capellini and two other detectives drove the 150 feet from where they were parked to the corner of Nostrand and Putnam.
The two other detectives positioned themselves behind the phone booth while Detective Capellini exited the van and walked around the booth where the person was standing and talking. The person in the snorkel jacket turned to Detective Capellini and asked whether the detective wanted to use the phone. Detective Capellini then asked the subject to remove his hood. When the subject complied, the detective was convinced that the person before him was the same person that he had seen in the photo, one Terrence Smoot. The defendant was asked to step into the van and he was asked his name. The defendant stated that his name was John Jones and that he lived at 395 Madison Avenue. Detective Capellini radioed Detective Lieutenant Gonzalez who arrived at the scene with a photo of the defendant. After a further visual comparison was made, the defendant was placed under arrest.
A few hours after his arrival at the precinct, the defendant was given Miranda warnings by Detective Deutsch. Defendant signed an acknowledgement that his rights were read to him. The defendant was then asked whether he wanted anything to eat or drink. The defendant was then interviewed by Detectives Deutsch and Anderson, and the defendant after a short period of time gave a statement which was committed to a writing by Detective Deutsch, read back to the defendant and then signed by him.
Later that evening Michael Woolerey observed a lineup at the precinct and identified the defendant who was placed in the number five position at his own request. The persons participating in the lineup consisted of six black males described as follows:
Number Height Weight Age
1 57" 140 30
2 5'9" 137 40
3 5'9" 190 25
4 511” 140 29
5 57" 145 21 (Defendant)
6 5'9" 165 37
*866 The fillers were obtained from a local men’s shelter. All participants were seated during the lineup and wore surgical masks over their heads as hoods. There was no contact between the defendant and Mr. Woolerey at the precinct prior to the lineup. On December 29, 1994, Kevin Fields viewed one photo of the defendant and identified him as Terrence Smoot.
CONCLUSIONS OF LAW
The defendant seeks, inter alia, to suppress the identification testimony of Michael Woolerey and his statement as the fruit of an unlawful stop and arrest. The court must first determine what level of interference was involved when Detective Capellini approached the defendant and requested or asked that he remove his hood.
It is undeniable that based on the statements of Kevin Fields, Michael Woolerey, and Selwin Foster as well as the identifications of the defendant in a photo array made by the latter two constituted probable cause to arrest the defendant.
Thus, on December 29, 1994, the police were staking out the premises at 395 Nostrand Avenue looking for a particular person named Terrence Smoot. The defendant was not stopped, nor was his movement interfered with as he was already stopped while making a call in the phone booth. (See, People v Ocasio, 201 AD2d 15; People v Fabian, 178 AD2d 544; People v Elsberry, 157 AD2d 848; People v Mallet, 164 Misc 2d 1009.)
The police, looking to arrest Terrence Smoot, saw a person emerge from the premises under surveillance and then almost immediately return. That person was wearing a snorkel coat with the hood pulled tight almost completely covering the subject’s face. This extreme covering of the head and face was deemed suspicious as the temperature was particularly warm for a day in late December. The question to be decided is whether Detective Capellini’s request of the defendant to remove his hood constituted a first level intrusion, namely a request for information regarding identity or a second level intrusion, namely a common-law inquiry.[1] (People v De Bour, 40 NY2d 210, supra; People v Hollman, 79 NY2d 181.) A request for information regarding identity or destination need be supported only by objective credible reason not necessarily *867 indicative of criminality. A common-law inquiry must be supported by a founded suspicion that criminality is afoot. (People v De Bour, supra, at 219; People v Reyes, 83 NY2d 945, 946; People v Bora, 83 NY2d 531; People v Hollman, supra, at 189-190; People v Moore, 47 NY2d 911.)
This court in deciding this issue has considered the content, nature and number of the questions asked. (People v Hollman, supra, at 192.) The verbal interaction was commenced by the defendant who asked whether Detective Capellini wished to use the phone. The detective identified himself as a police officer and asked the defendant to remove his hood. The nature and content of the sole question asked prior to defendant’s removal of his hood may not rise to an encounter of harassment or intimidation. Although it appears that the defendant did not know of the presence of the two detectives behind the phone booth (see, People v Mallet, supra), the mere presence of more than one police officer at the scene does not automatically convert a request for information to a common-law inquiry (see, People v Hollman, supra, at 186). Thus, the removal of defendant’s hood was a voluntary act and not a submission to authority. (People v Reyes, 83 NY2d 945, supra.) A reasonable person would have believed that he was free to walk or even to run away or to refuse to comply with the detective’s request. (People v Howard, 50 NY2d 583; People v Holmes, 81 NY2d 1056, 1058; People v Martinez, 80 NY2d 444, 447-448; People v Hicks, 68 NY2d 234, 240.)
The discussion, however, does not end here as the various Hollman factors discussed above need only be considered, but are not determinative of the issue. The request for the defendant to open his hood was more than a request for information regarding identity even though the sole purpose of the request was to ascertain whether the subject was in fact Terrence Smoot. The approach to and request of defendant is analogous to an approach and a request to open or to unzip a bag and must be supported by a founded suspicion that criminality is afoot. (See, People v Youngerman, 207 AD2d 850, lv denied 84 NY2d 1040; People v Boyd, 188 AD2d 239.) The detectives had probable cause to arrest Terrence Smoot. They believed Terrence Smoot to be living with his girlfriend at the premises under surveillance. The appearance of a person exiting the subject premises who was the same height as Terrence Smoot and who was wearing a snorkel coat with the hood pulled tightly closed on a warm December day warranted the approach of Detective Capellini not only to make inquiry about *868 the person’s identity but also permitted the detective to ask the defendant to remove his hood. The totality of the circumstances supported the detective’s reasonable belief that criminality was afoot. Thus, the approach to and the request of the defendant to open or to remove his hood was justified. (See, People v De Bour, 40 NY2d, supra, at 221.) The actions of the detectives were not based on mere whim or caprice or idle curiosity The approach and the request to open or to remove the hood was short of a forcible seizure (People v Moore, supra, 47 NY2d 911, revg 62 AD2d 155, 159, based on dissenting opn; People v De Bour, supra, at 223).
The defendant also contends that the lineup identification of the defendant by Michael Woolerey was suggestive because of the alleged age disparity between the defendant and two of the fillers. The court first notes that the photo array shown Mr. Woolerey almost two months prior to the lineup was not suggestive.[2] The other participants in the lineup had the same general physical characteristics as the defendant. (People v Allah, 158 AD2d 605; People v Thompson, 143 AD2d 858.)
There is no requirement, however, that the defendant be surrounded by individuals who are identical in size or appearance. (People v Robert, 184 AD2d 597; People v Allah, supra; People v Thompson, supra.) Any discrepancies in age are not readily discernible by a visual inspection of the lineup photos. Each participant in the lineup wore a surgical mask hood to cover up his hair as the defendant had braided hair at the time of arrest. This court concludes that neither the defendant nor any of his characteristics was highlighted or accentuated. The court finds that the procedure and circumstances surrounding the lineup identification was not unduly suggestive.
The court also finds that the showing of one photograph to Kevin Fields was merely confirmatory. Ordinarily a photographic identification is suggestive when only one photograph is shown to the witness. (People v Munroe, 185 AD2d 530; People v Mallory, 126 AD2d 750; People v Jackson, *869 118 AD2d 655; People v Velez, 109 AD2d 767.) As Fields knew the defendant and his family well for many years and were close friends, the single photo identification is permissible as confirmatory. (People v Rodriguez, 79 NY2d 445; People v Williamson, 79 NY2d 799.) The People’s application for a Rodriguez inquiry immediately prior to trial is granted in order to determine whether Mr. Foster and the defendant were well known to each other. If the People are unsuccessful in the Rodriguez hearing, then the People’s application for an independent source hearing is also granted.
The police were required to and did provide Miranda warnings to the defendant prior to his being questioned. Defendant signed an acknowledgement card that recited the rights that the defendant had been advised of by the detective. The defendant knowingly and voluntarily waived his Miranda rights when he made his statement. The defendant’s constitutional rights were not violated. The People have met their burden beyond a reasonable doubt that the defendant’s statement was voluntary.

. Even prior to People v De Bour (40 NY2d 210), the Court of Appeals had reiterated and reaffirmed the right of the police to make inquiries into suspicious or unusual street actions under the common law. (People v Rivera, 14 NY2d 441; People v Entrialgo, 14 NY2d 733.)

. Defendant contends that the detectives’ use in the arrays of defendant’s photo taken at the time of a prior arrest taints the lineup identification as the charges in that case were dismissed. This argument has little merit as two months elapsed between the identification procedures. This is sufficient time to alleviate and to nullify any purported taint. Even if this court were to find a technical violation of CPL 160.50, suppression would not be granted as no constitutional interests or considerations are implicated. (People v Patterson, 78 NY2d 711.)