OPINION OF THE COURT
Barry Kamins, J.
The defendant was indicted for criminal possession of a weapon in both the second and fourth degrees. The defendant moved to suppress the gun seized and all oral and written statements. A hearing was held before this court on February 3, 2010. The People called two witnesses, Detective Omar Garib and Detective Edwin Santiago. The defendant did not call any witnesses. The pertinent facts, as testified to by the detectives at the hearing, were not seriously disputed by the defendant. Accordingly, the court accepts and credits the testimony of both witnesses who testified.
Findings of Facts
Detective Omar Garib testified that on July 18, 2008 he was provided with a document which contained an anonymous tip regarding an individual who possessed a gun. The document was from “Operation Gun Stop” which is a Police Department initiative to retrieve guns. Under this program, an anonymous informant may call in a tip about the location of a gun to a telephone number designated by the Police Department. The tipster is provided with a confidential number. If the tip results in the recovery of a gun, the tipster may go to a designated bank with the number and receive a monetary reward. The identity of the tipster is never known to the police.
The anonymous tip disclosed that a black male, 23 years old, 5 feet, 9 inches tall and weighing 150 pounds, was in possession of a vehicle and that there was a gun under the driver’s seat. The car was described as a gray four-door Pontiac and a license plate number was provided. The tip indicated an address at which the car was parked. The gun was described as being a black and silver .45 caliber weapon.
Garib did not recall if this document was given to him or was left on his desk. He did not know who provided the tip, when it *965 was provided or when and how the tipster obtained the information. He did not know when the tip was received by the Gun Stop Program. Garib did not do anything with the tip until the next day.
On July 19, 2008, Garib prepared a complaint form and began to investigate the matter. Initially, Garib reviewed motor vehicle records. He learned that a vehicle with the license plate number provided by the tipster was registered to a woman at the address described in the tip. The description of the car matched the one provided in the tip. Shortly thereafter, Garib and his partner, Detective Edwin Santiago, went to the address where the car was registered. They did not see the car. They drove around for a few minutes and, when passing the location again, observed the car described in the tip. The car was in a stationary position at the curb in front of the premises with the motor running. A black male, the defendant, was seated in the driver’s seat. This individual matched the description of the individual in the tip. The officers pulled their unmarked car to the back of and parallel to the defendant’s car. Although the testimony regarding the position of the police vehicle is less than clear, Garib testified that the police vehicle was parked diagonally to the defendant’s car. Garib also testified that the defendant could not move his car as a result of the manner in which the police car had been parked.
Garib approached the defendant’s vehicle from the passenger side and Santiago approached from the driver’s side. Garib stood in the street and Santiago was on the sidewalk. Garib could not recall if the passenger window was open, but he did not hear the conversation between Santiago and the defendant. He was able to observe the defendant and described the defendant as looking nervous because he started fidgeting. He did not observe any bulges or anything that appeared to be contraband on the defendant. Garib testified that he did not observe any conduct indicative of criminality.
Santiago testified that he asked the defendant for his license and registration. The defendant provided Santiago with an employment identification card and a shield which indicated that he held the title of officer.* Santiago maintained that as the defendant handed the documentation over, the defendant’s hand was shaking. Santiago described the defendant as acting in a *966 nervous and fidgety manner. He acknowledged that on prior occasions, he had observed individuals who became nervous because they were in the presence of the police and not as a result of having been engaged in criminal activity. However, Santiago maintained that the defendant should not have been nervous because of his prior experience as an officer.
When Santiago asked the defendant if he was authorized to carry a gun, the defendant hesitated and tried to raise the window. At that time Santiago had one hand on the car door and could feel the window start to rise. Santiago then placed both his hands on the window and instructed the defendant, for the officer’s safety, to “leave everything the way it is and don’t close the window.” The defendant inquired as to what this was all about and Santiago advised him that his partner would explain. Santiago asked the defendant to step out of the car. Santiago followed the defendant to the back of the defendant’s car. Santiago testified that prior to requesting the defendant to step out of the car, he did not observe any criminal conduct. Santiago maintained that he asked the defendant to step out of the car for safety reasons; he recalled that the tip indicated that the gun was under the seat of the car, and he was concerned with the defendant’s “nervousness.”
As the defendant stood at the rear of the car, his back was against the trunk and Santiago and Garib stood in front of him. According to Garib, the defendant could have left only by going over the car or “through” the two officers. However, the defendant was not cuffed, nor did the officers draw their weapons. The officers extended courtesies to the defendant because he was an officer.
Garib advised the defendant of the investigation and inquired as to whether there was a gun in the car. The defendant started looking around and then stated that in the past, he had possessed a gun that belonged to his cousin, although he had gotten rid of it. According to Garib, after one or two minutes of questioning, the defendant “broke down” and admitted that there was a gun in the door of the car. Santiago went to the car and advised Garib that there was a gun. Garib advised the defendant that he would have to go to the precinct and considered him under arrest although he was not handcuffed. Santiago drove the defendant’s car back to the precinct.
The defendant was advised of his Miranda warnings after he had been at the precinct approximately three hours. He waived the presence of counsel and provided a statement. The sum and *967 substance of the statement was that on two occasions, he had been threatened by someone in his neighborhood and did not know what to do. He hoped that this case would “all go away” because he wanted to provide for his family and did not want to lose his job. The defendant then reduced the statement to a writing. The written statement did not disclose anything about the possession of a weapon.
Legal Analysis
The threshold question is whether, on the facts of this case, the defendant had been seized and, if so, whether the seizure was lawful (see People v Cantor, 36 NY2d 106, 110 [1975]). A second issue is whether, assuming a seizure had occurred, this particular anonymous tip to “Operation Gun Stop” was sufficiently corroborated to establish reasonable suspicion, justifying the stop. “[I]nquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions” (People v De Bour, 40 NY2d 210, 223 [1976]). The court must weigh the intrusion against the predicate to determine the extent to which the intrusion was authorized (see People v Stewart, 41 NY2d 65, 66 [1976]).
In People v De Bour, the Court of Appeals established the graduated four-level test for evaluating the propriety of police conduct in encounters while acting in a law enforcement capacity (see People v Moore, 6 NY3d 496, 498 [2006]). The first level permits a police officer to request information from an individual and merely requires that the request be supported by an objective credible reason, not necessarily indicative of criminality. The second level known as the “common-law right of inquiry” requires a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion (see People v Moore, 6 NY3d at 498). The difference between the level-one and level-two encounter is the type and content of questions posed by law enforcement officers (see People v Hollman, 79 NY2d 181, 190-191 [1992]). A level-two “common-law inquiry” permits questions that are accusatory in nature and focuses on the possibility of criminality. A seizure is not permitted under either level one or two (see People v May, 81 NY2d 725, 728 [1992]).
The third level under De Bour permits a seizure, i.e., a police officer may forcibly stop and detain an individual. However, a seizure is not permitted unless there is reasonable suspicion that an individual is committing, has committed or is about to commit a crime (see People v Cantor, 36 NY2d at 112). Reason *968 able suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe that criminal activity is at hand (see People v Cantor, 36 NY2d at 112-113). Finally, the fourth level authorizes an arrest based on probable cause to believe that an individual has committed a crime (see People v Moore, 6 NY3d at 499).
In proceeding with the analysis under De Bour, the court must examine the extent of the intrusion (see People v De Bour, 40 NY2d at 216). Initially, during oral argument, the defendant argued that the police had effected a stop of a moving vehicle which had to be supported by reasonable suspicion. However, since the defendant’s car was stationary alongside the curb and was not moving, the police conduct did not constitute the stop of a moving vehicle (see People v Harrison, 57 NY2d 470, 475 [1982]). As such, the police did not need reasonable suspicion to approach the stationary car in order to request information or conduct a common-law inquiry (see People v Spencer, 84 NY2d 749, 753 [1995]).
The defendant further argues that the approach by each officer on both sides of his car, the direction not to raise the window and the direction to exit the car constituted a seizure. The People argue that this did not constitute a seizure. Rather, the People maintain that the conduct of the police officers was consistent with the right to request information pursuant to a “common-law inquiry.”
The test for determining whether the actions of law enforcement officers constitute a seizure is “whether a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom” (People v Ocasio, 85 NY2d 982, 984 [1995]).
“Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment .... This is true whether a person submits to the authority of the badge or whether he succumbs to force” (People v Cantor, 36 NY2d at 111 [citations omitted]).
Under certain circumstances, directing an individual out of a vehicle has been held to constitute a seizure (see People v Thomas, 275 AD2d 276 [1st Dept 2000]; People v Atwood, 105 AD2d 1055 [4th Dept 1984]).
In Cantor, the police blocked the defendant’s parked vehicle with their own car. Immediately thereafter, three police officers *969 approached the defendant as he was getting out of the car. The Court held this to be a seizure finding that “[t]he defendant was deprived of his freedom of movement when he was encircled by three police officers as he stood alongside his car which was blocked by the police vehicle. At that moment he could not have proceeded on his way, therefore he was seized” (People v Cantor, 36 NY2d at 111-112). The Court further found that since the police did not observe the defendant’s participation in any criminal acts and lacked independent knowledge and information that a crime had been committed, the seizure was not authorized.
In People v Harrison (57 NY2d 470 [1982]), two police officers observed three men in a dirty rental car. The officers followed the car and, after it stopped, parked behind it. As they approached the car on foot, one of the passengers opened the door and tried to get out. The officers told the passenger to get back in the car and directed another passenger to “sit up.” {Id. at 473.) After checking to see if the car had been reported stolen, an officer observed one of the passengers in a crouching position. When he shined a flashlight into the car, he saw a gun. An additional gun was recovered following a search {see People v Harrison, 57 NY2d at 473-474).
The Court upheld the suppression of the guns. The Court found that
“if the police escalate the encounter as they did here by exercising restraint over the individual as opposed to his vehicle, even out of concern for their safety, a more substantial predicate is required. In other words, before the police can forcibly stop or constructively stop an individual as was done here by the order to remain in the car, there must be some articulable facts, which initially or during the course of the encounter, establish reasonable suspicion that the person is involved in criminal acts or poses some danger to the officers” (People v Harrison, 57 NY2d at 476).
Here, as argued by the defendant, the direction by Santiago to exit the car constituted a seizure (see People v Thomas, 275 AD2d 276 [2000]; People v Atwood, 105 AD2d 1055 [1984]). Normally, a police officer can direct a motorist to exit a vehicle as part of a routine traffic stop. However, as noted above, this case does not involve the stop of a moving vehicle; the police directed an individual to exit a vehicle that was stationary and *970 parked alongside a curb. Under these circumstances, without reasonable suspicion, it is improper for the police to direct occupants out of a car. Even if the prosecutor were to argue that the direction to exit the vehicle was given out of a concern for the officers’ safety, that argument is belied by the fact that the officers did not frisk the defendant after he exited the vehicle and permitted him to walk to the rear of the vehicle. Even at that point, the defendant was not frisked. Further, there were no articulable facts that the defendant posed a danger to the officers (see People v Harrison, 57 NY2d at 476).
Additionally, even if the direction to exit the vehicle was not in and of itself a seizure, this court finds that under the totality of circumstances, the defendant was seized. In addition to the direction to get out of the car, the police vehicle blocked the defendant’s car from moving, the police officers stood on both sides of the defendant’s car, one officer had his hand on the door of the car, the defendant was not permitted to close his window and the defendant was directed to the rear of the car where his back was up against the trunk of his car with two officers standing in front of him. Under these circumstances, a reasonable person would have not believed that he was free to move or able to move on his way. Accordingly, this court finds that the actions of the police officers resulted in a seizure of the defendant.
Having determined that a seizure had been effected, the court must examine whether the predicate upon which the police based their actions justified the seizure (see People v Stewart, 41 NY2d at 66). The defendant argues that the predicate upon which the police acted was an anonymous tip which was insufficient to permit the actions of the police officers. The People argue that this tip was more reliable than a routine, garden variety tip in that it was made to the “Operation Gun Stop” initiative. The People assert that since, under this program, informants receive money if weapons are retrieved, then there is more of an incentive for an informant to provide reliable information. Thus, the People argue that the tip should be afforded a greater degree of reliability and that this information justified the actions of the police.
The concern regarding an anonymous tip is the inability to test the reliability of such information. Information obtained from an unknown source prohibits a determination of the informant’s basis of knowledge and veracity, making it unreliable (see Florida v J.L., 529 US 266, 270 [2000]). Corroboration *971 of an anonymous tip may provide the tip with some indicia of reliability (see People v William II, 98 NY2d 93, 99 [2002]). An anonymous tip may be sufficient to invoke a level-one inquiry, a mere request for information as well as a level-two inquiry, the common-law right to inquire (see People v Stewart, 41 NY2d at 69). However, an anonymous tip will not, in and of itself, constitute reasonable suspicion justifying a seizure (see People v Moore, 6 NY3d at 499).
Corroboration of the criminal activity described in the anonymous tip may elevate the amount of information to the point where an officer may seize an individual. However, corroboration of information merely relating to the identity of the person described in the tip, without corroborating any criminal activity, does not raise the level of information to “reasonable suspicion.” A tip must be reliable in its assertion of criminality, not just in its tendency to identify a specific person, for the tip to constitute “reasonable suspicion” and justify a seizure (see Florida v J.L., 529 US at 272).
In Florida v J.L., the police received an anonymous tip which provided a physical description of an individual including the color of his shirt. The tip provided a location and maintained that the individual was carrying a gun. The officers arrived at the location, and observed three individuals, one of whom matched the description in the tip. The officers approached the defendant and frisked him. The Court found that the anonymous tip lacked any indicia of reliability and was insufficient to justify a stop and frisk (see Florida v J.L., 529 US at 275). The tip only corroborated the identity of the individual. There was no corroboration of any criminal activity (see Florida v J.L., 529 US at 272).
In People v Moore, the police received an anonymous tip describing an individual who possessed a gun and who had been involved in a dispute. When the officers arrived at the location, they observed the defendant, who matched the description in the tip. As the officers approached, the defendant began to walk away. The officers drew their guns and yelled “police, don’t move.” (6 NY3d at 497.) When told to put his hands up, the defendant made a movement toward his waistband; he was frisked by one of the officers and a gun was discovered (see People v Moore, 6 NY3d at 497). The Court held that “[a]n anonymous tip cannot provide reasonable suspicion to justify a seizure, except where that tip contains predictive information — such as information suggestive of criminal behavior — so that the police *972 can test the reliability of the tip” (People v Moore, 6 NY3d at 499). The Court found that since there was no corroboration of any criminal activity, the anonymous tip triggered only the common-law right of inquiry. The officers would have been justified in asking questions or following him, but it did not authorize a seizure of the defendant. “[A] forcible stop requires reasonable suspicion that the suspect has committed a crime, not merely the founded suspicion — triggering the officers’ common-law right of inquiry” (People v Moore, 6 NY3d at 501).
In the present case, according to the testimony, an individual anonymously provided the Operation Gun Stop initiative with a tip concerning the location of a gun. The officers who investigated the tip were merely provided with a police document indicating that a tip had been reported. The officers did not know who provided this information to the program, when it was provided, or how and when the informant obtained the information. The officers did not know the basis of the informant’s knowledge and were not able to determine the veracity of the informant.
Although the People argue that anonymous tips to this program are more reliable because the tipster might receive a reward, they have not offered any evidence to support this theory. In fact, just as persuasive is the defendant’s argument that since the tip is anonymous, an individual may just report the possibility of a gun in the hope that he or she is correct and will receive a reward. As with most anonymous tips, the basis of knowledge and the veracity of this informant cannot be evaluated. There is no information regarding how or when the tip was received. There is nothing that distinguishes this tip from any other anonymous tip or makes it more reliable. Accordingly, this court finds that under the facts of this case, an anonymous tip to the Operation Gun Stop program is subject to the same scrutiny as any other anonymous tip.
Accordingly, the predicate upon which the police acted in the present case was an anonymous tip that provided a description of an individual, a vehicle and a license plate number, an address where the vehicle was kept and the fact that the individual possessed a gun under the front seat. The information corroborated by the officers was that a vehicle matching the description and bearing the license number was registered to a woman, not a male as described in the tip, at the address provided in the tip. Further, the police observed an individual that fit the description, provided by the tip, in the vehicle. The *973 corroboration of the information related only to the identity of the target of the tip. There was no corroboration of any criminal activity (see Florida v J.L., 529 US at 272). As such, the anonymous tip provided the police with authorization to request information (level one) and the common-law right to inquire (level two) but was not sufficient to establish reasonable suspicion justifying a seizure of the defendant (see People v Moore, 6 NY3d at 501).
Finally, the People argue that the tip was corroborated by the nervous conduct of the defendant. However, the actions described by the police are also susceptible to an innocent interpretation: the fact that the defendant’s hand shook when he offered his identification, that he looked in a different direction, and hesitated in answering a question. In fact, the officers testified that they did not see anything indicative of criminality, such as a bulge in the defendant’s waistband. When behavior is susceptible to innocent interpretation, it cannot be used to corroborate an anonymous tip to create reasonable suspicion (see People v Moore, 6 NY3d at 501; see also People v De Bour, 40 NY2d at 216).
Conclusion
Accordingly, this court finds that the actions of the police officers constituted a seizure, and that the anonymous tip without corroboration of criminal activity did not authorize the interference. The seizure of the defendant was improper. The gun retrieved from the defendant is suppressed. Further, the subsequent statements taken of the defendant are also suppressed as fruits of the poisonous tree (see People v Andrades, 219 AD2d 656, 657 [2d Dept 1995]). The statements were a spontaneous reaction and a direct consequence of the illegal seizure (see People v Sampson, 68 AD3d 1455, 1457-1458 [3d Dept 2009]).

 Although the transcript indicates an officer with the Department of Homeland Security, this may be an error but is not relevant to any of the issues.