*614 OPINION OF THE COURT
Leonard P. Rienzi, J.
A Dunaway /Mapp /Huntley hearing was conducted before me on December 7, 1999. Two witnesses, Police Officer Raymond Pepitone and Sergeant Michael Carbonara, testified. I found each to be credible. I find the following facts:
On September 25, 1999 at approximately 2:30 a.m. Officer Pepitone and Sergeant Carbonara were on routine patrol in a marked police car in the Park Hill-Stapleton area of Staten Island. Officer Pepitone had been a police officer for seven years. Sergeant Carbonara had been a police officer for 20 years and a sergeant for 11. Both were assigned to the Staten Island Task Force. Both officers observed a gray Nissan Maxima with covered license plates and excessively tinted windows being driven in violation of the Vehicle and Traffic Law (Vehicle and Traffic Law § 402 [1]; § 375 [12-a] [b] [2]). Using the turret lights and a hit on the siren, the officers pulled the car over to issue traffic summonses. The Nissan stopped on Osgood Avenue near the corner of Vanderbilt Avenue. Keith Jackson was driving the Nissan. The defendant was seated in the front passenger seat. The patrol car, with “take down” lights focused, was parked three feet behind the Nissan.
Both officers left their patrol car and approached the Nissan. Neither had his gun drawn. Officer Pepitone approached the driver side. As Sergeant Carbonara approached the passenger side, the defendant opened the car door and was about to exit. He had money in his hand and asked if he could buy a drink at a nearby store. Sergeant Carbonara told defendant that he could buy his drink when the car stop was over. As defendant, who was seated in the vehicle, was pulling the door closed, Sergeant Carbonara also pushed the door closed. Defendant immediately placed his hands on the ceiling of the car. When asked why he had done so, defendant stated that he did not want to get shot. Officer Pepitone then told defendant that he should relax because he was in Staten Island where the police are friendly. Officer Pepitone then asked Jackson, the driver, for his license, registration, and insurance card. He recognized Jackson from a prior arrest four years earlier. Jackson provided the documents. Both officers returned to the patrol car. As both officers were reviewing the paperwork provided by Jackson and Sergeant Carbonara was entering data into the computer in the patrol car, each officer heard a sound emanate from the interior of the Nissan. The windows of both the Nissan and the patrol car were open.
*615 According to Officer Pepitone, “It was a metallic sound, very much like the sound that I hear when we’re at the range, practicing at the NYPD range. It’s the racking of a slide * * * The sound of it is, it sounds like metal sliding against metal, and then banging.” (Hearing minutes, at 12-13.) According to Sergeant Carbonara, “I heard a slide racking on a semiautomatic weapon. It’s a double metallic sound. It’s one clank when the slide goes back and another clank when the slide goes back forward.” (Hearing minutes, at 63-64.) Both officers carried semi-automatic handguns. Both were thoroughly familiar with the “racking” sound.
The tinted windows of the Nissan prevented the officers from seeing anything more than shadows inside the Nissan. Each officer acknowledged to the other that he had heard the “racking” sound. The officers decided to investigate further and again approached the Nissan. Out of concern for safety, both officers now approached the Nissan in the “ready position,” i.e., each with a hand on his gun, ready to draw it from the holster. Officer Pepitone again approached the driver. As Sergeant Carbonara approached the passenger side of the Nissan, defendant opened the door and stepped out. He said he wanted to go to the store. Sergeant Carbonara told him he could go to the store but that first the sergeant wanted to check him for weapons. Defendant did not respond. He turned his back as Sergeant Carbonara attempted to search him. Although Sergeant Carbonara was able to pat down the sides and rear of defendant’s waistband, defendant kept turning his body away from the sergeant, preventing the sergeant from patting down the front of defendant’s waistband. After two unsuccessful attempts to pat down the front of defendant’s waistband, Sergeant Carbonara grabbed the left side of defendant’s shirt and lifted the shirttail. He then observed the butt of a handgun protruding from defendant’s waistband. At the same time Sergeant Carbonara saw the gun, he also saw defendant reaching for that area. Sergeant Carbonara yelled to his partner, “He’s got a Clock!” Defendant stated, “It’s not a Clock.” The sergeant pushed defendant to the ground with his left hand, and drew his gun with his right hand. He held defendant at gunpoint as Officer Pepitone handcuffed him. Sergeant Carbonara recovered the gun from the bottom of defendant’s pants leg where it had slipped.
He inspected the gun and found it to be a 9mm semiautomatic containing a magazine with six live rounds. There were no rounds in the chamber. The gun was loosely con *616 structed and made entirely of steel. The Glock 9mm semiautomatics carried by each officer were more tightly constructed and were part steel and part plastic. Based on its construction and component material, the racking sound of the recovered 9mm gun was louder than the racking sound of each police officer’s 9mm gun.
As defendant was being handcuffed he looked in the direction of Keith Jackson whom Officer Pepitone had told not to move. Pepitone asked defendant if Jackson was also involved. Defendant responded, “It’s not his gun. It has nothing to do with him.” At the precinct during arrest processing defendant asked Officer Pepitone if he was being charged with a loaded gun or just a gun.
After defendant’s arrest, the Nissan door from which he had exited remained open. On the floor in front of the passenger seat, Sergeant Carbonara observed a live round of 9mm ammunition. According to the credible testimony of both officers, when the magazine is fully inserted in the gun and the gun is racked, a round is stripped from the magazine and injected into the chamber. If one presses the magazine release button, disengaging the magazine, and racks the slide, a round in the chamber will be ejected. The magazine can then be re-engaged without ever leaving the firearm.
The area in which this incident occurred (the vicinity of Vanderbilt Avenue and Osgood Avenue) is a high-crime area. According to Officer Pepitone it is a “drug prone location” where there are an “inordinate amount of arrests” for “both guns and drugs.” (Hearing minutes, at 55.) According to Sergeant Carbonara, the precinct pin map indicates a high level of crime in the area. Sergeant Carbonara, who supervises all of Staten Island at night, assigns a patrol car to this particular area each night “because of violent felonies.” (Hearing minutes, at 95-96.)
CONCLUSIONS OF LAW
The ultimate burden of proof in a motion to suppress physical evidence lies with the defendant. (See, People v Bouton, 50 NY2d 130 [1980]; People v Berrios, 28 NY2d 361 [1971]; People v Di Stefano, 38 NY2d 640 [1976].) While the People must initially go forward to show that the evidence which they seek to introduce against the defendant was acquired in a legal manner (People v Malinsky, 15 NY2d 86 [1965]; People v Berrios, supra, at 367; People v Whitehurst, 25 NY2d 389 [1969]), once such a showing has been made, the ultimate burden shifts to the defendant (see, People v Berrios, supra, at 367).
*617 The police officers had a reasonable suspicion that the Nissan was being operated in violation of specific sections of the Vehicle and Traffic Law. The stop of the vehicle was lawful. (People v Ingle, 36 NY2d 413 [1975].)
The critical issue in this case is the lawfulness of Sergeant Carbonara’s ordering the defendant, a passenger, to remain in the car while the police examined the car’s documentation and issued summonses to the driver.
The touchstone of a Fourth Amendment analysis is the reasonableness under all the surrounding circumstances of the particular governmental intrusion into the personal security of a citizen. (See, Terry v Ohio, 392 US 1 [1968].) The reasonableness inquiry requires balancing a demonstrated public interest and the individual’s right to be free from arbitrary interference by agents of the State. (United States v Brignoni-Ponce, 422 US 873 [1975].) Since the traffic stop of the car was lawful, the initial focus of this inquiry must be the intrusion resulting from the order by Sergeant Carbonara that defendant remain in the car until the traffic stop was concluded.
The Supreme Court has recognized that there is an “inordinate risk” confronting police officers during traffic stops. (Pennsylvania v Mimms, 434 US 106 [1977].) A “significant percentage of murders of police officers occurs when the officers are making traffic stops.” (United States v Robinson, 414 US 218, 234, n 5 [1973].) Thus, a police officer who has lawfully stopped a vehicle for a traffic infraction may, as a safety precaution, order the driver to exit the vehicle. (See, Pennsylvania v Mimms, supra, at 111.) When considering these safety concerns, the degree of intrusion from the order to exit the car is de minimis. (See, supra.)
The Supreme Court extended this rule to cover passengers in Maryland v Wilson (519 US 408, 414-415 [1997]). There, the Court noted that “the motivation of a passenger to employ violence to prevent apprehension * * * is every bit as great as that of the driver,” and held that “an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.” (Supra, at 414, 415.) The Court specifically noted that “the additional intrusion on the passenger is minimal.” (Supra, at 415.)[1]
*618 Likewise, the New York Court of Appeals has determined that “precautionary police conduct directed at a passenger in a lawfully stopped vehicle is equally authorized.” (People v Robinson, 74 NY2d 773, 775 [1989].) Thus, a passenger may be ordered from a vehicle lawfully stopped for a traffic violation because the risks inherent in the interaction between police officers and civilians in these situations are the same whether the occupant is the driver or a passenger. (See, supra.) There is no legal distinction between the driver and the passenger when evaluating the propriety of “precautionary police conduct” at the scene of a lawful traffic stop. (Supra.)[2]
If the degree of intrusion engendered by a police order to exit a lawfully stopped vehicle is considered de minimis (Pennsylvania v Mimms, 434 US 106, 111, supra), likewise is a police order for an occupant to remain in the vehicle. Unlike Judges, who decide these issues in comfortable chambers with transcripts, opposing briefs, volumes of case law, treatises, law clerks and computers, the police officer at a traffic stop must make what may be a life or death decision in a matter of seconds. Clearly the officer on the scene of this potentially dangerous street encounter must have the discretion to determine whether safety concerns require the occupants of a lawfully stopped vehicle to exit the vehicle or remain inside the vehicle.[3]
The major intrusion on personal liberty had already occurred when the passage of the vehicle on a public thoroughfare was interrupted by the lawful order of the police. The only remain *619 ing issue is whether the police will be able to satisfy the purpose of the lawful stop in a relatively safe environment with the occupants of the vehicle inside or outside the vehicle.
Under the circumstances of this case Sergeant Carbonara’s order that defendant remain in the vehicle while the summonses were issued was appropriate. The incident occurred at 2:30 a.m. There is no evidence of anyone else on the street with the exception of the two police officers and the two occupants of the stopped vehicle. Both officers were highly experienced, and were familiar with the neighborhood of the stop with its prevalence of narcotics, guns and violent felony activity. Sergeant Carbonara, who supervised all of Staten Island, a community of more than 400,000 people, found it necessary to assign a car to this particular area each night because of the high incidence of violent felonies.
In addition, Officer Pepitone recognized the driver as someone he had arrested before. Significant also is the fact that the Nissan in question was being driven with tinted windows in violation of the Vehicle and Traffic Law. Tinted windows pose a significant danger to approaching police officers who are unable to see clearly what the occupants may be doing.
The circumstances surrounding this particular car stop demonstrate the wisdom of Sergeant Carbonara’s decision that defendant remain in the car while the summonses were being issued. Three documents relating to the Nissan were being examined: the driver’s license, the vehicle registration and the insurance card. In addition to visual examination of the proffered documents, information from the documents was being entered into the computer terminal in the patrol car. While the officers were examining the documents and simultaneously entering the data into the computer terminal, both officers were somewhat distracted from the Nissan and its occupants. If both occupants remained in the Nissan, both police officers (who were parked three feet behind, with turret light flashing and “take down” lights focused) could glance up and observe the Nissan and its occupants. If one occupant were allowed to leave and wander out of the officers’ line of sight, the ability of two officers to conduct their required business in a safe environment is significantly diminished. Considering the nature of the car stop (tinted windows), the time of the stop (2:30 a.m.), the isolation of the area, the nature of the neighborhood relating to criminal activity (drugs, guns, violent felonies) and the experience level of the officers (20 years, 7 years), the “precautionary police conduct” of requiring defendant to remain in the car con *620 stituted a reasonable and de minimis intrusion on his liberty. This minimal degree of intrusion was based on a commonsense response by experienced police officers to a potentially life-threatening situation.
When the experienced officers, having lawfully stopped a car for tinted windows in an area known for drug, guns and violent felony arrests, heard what each recognized as the racking of a slide on a semi-automatic handgun, the officers were duty bound to investigate the source of this sound. The defendant, who had been told to remain in the car before the officers heard the racking sound, renewed his efforts to leave the scene moments after both officers heard the ominous sound. When told that Sergeant Carbonara wanted to check him for weapons, he did not respond verbally but rather turned his back to the sergeant preventing the sergeant from seeing or patting his front waistband, an area which is a common repository for concealed illegal weapons.
The totality of circumstances prior to the frisk including (1) the nature of the car stop (tinted windows), (2) the time of the stop (2:30 a.m.), (3) the isolation of the area, (4) the officers’ direct personal knowledge of the nature of criminal activity in the area (drugs, guns, violent felonies), (5) the experience level of the police officers (20 years, 7 years), (6) the distinctive loud “racking” sound recognized by both police officers (who carried semi-automatic pistols), (7) the repeated attempt by defendant to leave the scene after being directed to remain, and (8) the turning away from the sergeant to prevent the front waistband frisk, provided reasonable cause to believe defendant might be armed and justified both the frisk and, as defendant prevented the full frisk, the lifting of defendant’s shirttail. The predicate for the police action taken justified the extent of the official intrusion. (See, People v De Bour, 40 NY2d 210 [1976].) Clearly, it would be unreasonable to deny a police officer the right “to neutralize the threat of physical harm” when he possesses an articulable reasonable suspicion that an individual whom “he is investigating at close range is armed and presently dangerous.” (Terry v Ohio, 392 US 1, 24 [1968], supra.) Seizure of the gun was justified.
Likewise justified was the seizure of the bullet seen in plain view on the car floor in front of defendant’s seat after defendant exited the car leaving the door open. The rational inference to be drawn from the credible testimony at the hearing was that defendant, prior to his second attempt to leave the scene, racked the slide with the magazine not fully engaged *621 thereby ejecting the bullet found on the floor from the chamber. His demonstrated intention was to leave the scene. Perhaps he ejected the round from the chamber as a safety precaution to avoid an accidental discharge during flight. His motivation, however, is neither relevant nor determinative. Since the bullet was observed in plain view, its seizure was justified. (Coolidge v New Hampshire, 403 US 443 [1971]; People v Jackson, 41 NY2d 146 [1976].)
The three statements made by defendant are voluntary beyond a reasonable doubt and admissible. The first statement (“It’s not a Glock”) was spontaneous. (Rhode Is. v Innis, 446 US 291 [1980]; People v Lynes, 49 NY2d 286 [1980].) The second statement (“It’s not his gun. It has nothing to do with him”) was made in response to a question asked to clarify a potentially dangerous situation involving the status of the armed defendant’s companion. No Miranda warnings were required. (New York v Quarles, 467 US 649 [1984]; People v Huffman, 41 NY2d 29 [1976].) The third statement (“Am I being charged with a loaded gun or just a gun?”) was likewise spontaneous and not the subject of police interrogation or its functional equivalent. (Rhode Is. v Innis, 446 US 291, supra.)
Defendant’s motion is denied in all respects.

. The Supreme Court specifically declined to reach the question here presented, namely, whether “an officer may forcibly detain a passenger for the entire duration of the stop.” (See, Maryland v Wilson, 519 US, supra, at 415, n 3.) The United States Circuit Courts of Appeals for the Third Circuit *618 and the D.C. Circuit have decided this issue. Each Circuit has held that the logic of Wilson may be extended to require a passenger to remain in the car. (See, United States v Moorefield, 111 F3d 10 [3d Cir 1997]; Rogala v District of Columbia, 161 F3d 44 [DC Cir 1998].)

. In light of Robinson (supra), which was decided by the Court of Appeals in 1989, defendant’s reliance on People v Greene (135 AD2d 449 [1st Dept 1987]) is misplaced.

. Although the Court of Appeals considered whether a police officer may prohibit passengers from leaving a car in People v Harrison, the officer in that case was detaining the passenger while “approach[ing] an individual for information,” and thus there was no initial legal stop. (People v Harrison, 57 NY2d 470, 475 [1982].) Moreover, the Court of Appeals explicitly relied on the absence of such a lawful stop to distinguish the United States Supreme Court’s decision in Mimms (supra): “The key fact in the Mimms decision is that the driver had been lawfully stopped for a traffic offense * * * The court did not hold that the police could take similar action when, as in the case now before us, the driver had not been lawfully stopped for a violation of the law.” (People v Harrison, supra, at 477.) Because the officer’s stop of the defendant in the instant case did, in fact, occur pursuant to a lawful stop for a traffic violation, Harrison is inapplicable.