[640 NYS2d 28]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MICHAEL ALEXANDER, Respondent.

First Department, March 26, 1996

APPEARANCES OF COUNSEL

*Tami J. Aisenson* of counsel, New York City *(Paul Harnisch* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

### OPINION OF THE COURT

MAZZARELLI, J.

The People appeal from a determination that the police acted improperly in arresting defendant after they observed him and a friend exit a car that was double-parked in front of a building with a known history of drug-related activity and arrests, enter the building, and emerge moments later, holding a small tinfoil packet of a size and shape commonly used to package cocaine that defendant then secreted in his jacket pocket. In reviewing the hearing court's ruling, we are called upon to answer the question of whether a tinfoil packet of a size and shape commonly associated with cocaine packaging may be deemed a "hallmark" rather than merely a "telltale sign" of criminal drug activity even in the absence of any observed drug sales or exchange of money. Under the totality of the circumstances presented at bar, we answer the question in the affirmative, and thus conclude that the police possessed probable cause to arrest defendant for illegal drug possession. Accordingly, we reverse.

The credible testimony at the suppression hearing established that on November 6, 1992, a plainclothes detective was assigned as part of a team of officers from the Manhattan North Tactical Narcotics Team to observe a building located at 476-82 West 165th Street that was known to the police to be a drug-prone location. The member of the backup team who actually arrested defendant testified that he had personally participated in upwards of 25 arrests at this address for possession or sale of drugs during the month preceding defendant's arrest. Indeed, the reputation of this building as a beehive of retail drug trafficking was confirmed by the defense's own witness, Matthew Deighan, who testified at the hearing that he

had personally purchased drugs at this location on "dozens" of previous occasions.

The undercover detective had been trained to recognize different types of drugs, including cocaine, marihuana and heroin, based on their appearance and packaging. He had personally participated in at least 300 "buy and bust operations" as the buying officer, and at least 500 such operations as the "ghost officer". He and the arresting detective had worked together in the Washington Heights area, including the block where this arrest occurred, for between two and one-half and three years. The arresting detective also had been trained in the identification and packaging of drugs, had previous experience as a member of the Street Narcotics Enforcement Unit before joining the Manhattan North Tactical Narcotics Team and had made between 500 and 700 previous narcotics-related arrests.

At approximately 2:50 P.M., the undercover detective was leaning on his unmarked rental car, which was parked in front of the building, about 15 to 20 feet away from its front door, when he noticed a brown Plymouth station wagon that double-parked opposite the building under observation. The car was occupied by two men, defendant Michael Alexander and Matthew Deighan, and a woman, Jamie Callin. The undercover detective then saw defendant and Deighan exit the car and enter the building, while Callin remained behind in the passenger seat.

Very soon thereafter, the undercover detective saw defendant and Deighan emerging from the building. According to the undercover detective, the two men were inside the building for only a matter of "several minutes". Deighan testified, more specifically, that they were inside "[m]aybe five minutes at best". In any event, it is undisputed that the two men were in and out of the building rather quickly.

As Deighan and Alexander made their way back to the station wagon, they passed right by the undercover detective. The two men appeared to be conversing, while Deighan was looking at and holding a tinfoil packet that he then placed inside his left jacket pocket. At the same time, defendant placed a tinfoil packet that he was holding in his right hand into his right jacket pocket. Although it was subsequently learned that Deighan's packet was approximately three and one-half inches in size, and defendant's packet was slightly larger, at the time the two men passed by him comparing what was obviously their recent drug purchases, the undercover could only see

about two inches of each tinfoil packet. The undercover officer conceded that he neither saw anyone hand the packets to the two men, nor saw any money change hands. Based on the totality of the observed conduct, as well as his experience and training, and familiarity with the prior history of drug activity in this particular building, the undercover detective believed the tinfoil packets to contain cocaine.

After the two men reentered the double-parked station wagon and drove away from the building, the undercover detective went into his car and made a radio transmission to his backup field team that included a description of the car, the license plate number, and details concerning the physical attributes and clothing of the car's occupants. The undercover detective also indicated that he observed the two men in possession of drugs that they had placed in their pockets. The arresting detective and other members of the field team stopped the car after following it for about 10 blocks.

Once defendant Alexander, Deighan and the woman had exited the car and placed their hands on the roof, the arresting detective asked defendant if he had any drugs on his person. Defendant responded negatively and the arresting detective reached into his right chest jacket pocket and removed the tinfoil packet. It is this contraband that was the subject of the suppression hearing.*

The legal issue presented on this factual record, as framed by the hearing court, was whether a small tinfoil packet constitutes a "hallmark" of a drug transaction. The hearing court, construing the then-applicable New York search and seizure

---

* Defendant has not submitted a respondent's brief on this, the People's appeal. At the hearing he called Matthew Deighan as a witness on his behalf. While defendant proffers no challenge to the hearing court's findings of facts, we note, in passing, that our independent review of the record reveals that they are fully supported.

Deighan, a former police officer, who was apparently permitted to resign from the New York Police Department while on suspension from active duty in 1987 from problems clearly related to chemical dependency, offered a version of events that appears to conveniently admit that portion of the People's case which was either incontrovertible or harmless to the defense and to contradict that which needed to be denied. Deighan testified that the tinfoil packets were smaller than the police testimony indicated, and that he and defendant placed the drugs inside their pants before leaving the building, and only removed them and placed them in their jackets once they were inside the car and driving away from the scene of the purchase. The hearing court found this and other portions of Deighan's testimony that contradicted that of the police to be unbelievable, a finding which, in light of the hearing court's vivid description of the witness's demeanor that might otherwise not have been revealed from the printed page, is amply warranted.

precedents, ruled that, based on what the undercover detective observed, the police possessed no more than a common-law right to inquire, and, that faced with defendant's denial when asked if he had narcotics in his possession, were required to let him reenter the car and proceed on his way without conducting a frisk or search of his person. Stating that it was dissatisfied with the result because in its view "[i]t is not reasonable", the hearing court explained that it viewed *People v De Bour* (40 NY2d 210) and its progeny as inexorably leading to suppression of the cocaine recovered from defendant's pocket. Precluded from introducing the contraband at trial, the People then certified that the sum of the proof available to them to prove the charge against defendant had been rendered insufficient as a matter of law (CPL 450.50 [1] [a]) and the instant appeal ensued.

It is well settled that a finding of "[p]robable cause requires, not proof beyond a reasonable doubt or evidence sufficient to warrant a conviction * * * but merely information which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed" (*People v McRay*, 51 NY2d 594, 602). That the application of this definition to any given set of facts is a difficult task is attested to by the legions of cases filling the pages of the Official Reports that seem at times to have contradictory results. There is, however, a unifying theme to the search and seizure jurisprudence of this State. The appellate courts have consistently emphasized, and it requires no citation, that reasonableness remains the touchstone by which police-citizen encounters are measured.

In a case decided after the hearing court rendered its decision, this Court had occasion to consider "whether the observation by an experienced police officer, in a 'drug-prone' location, of five separate transactions in each of which defendant exchanged money for a small object he removed from a brown paper bag and thereafter placed the bag on the ground next to a fence about 10 feet away, gives rise to probable cause" (*People v Graham*, 211 AD2d 55, 56 [Sullivan, J.], *lv denied* 86 NY2d 795). We held that the totality of the circumstances witnessed by the experienced police officer in *Graham*, if observed by any experienced police officer, would have reasonably led the officer to conclude that a drug sale had occurred. As the Court explained, "In a probable cause analysis, the emphasis should not be narrowly focused on a recognizable drug package or any other single factor, but on an evaluation of the totality of cir-

cumstances, which takes into account the 'realities of everyday life unfolding before a trained officer who has to confront, on a daily basis, similar incidents' (*People v Cabot*, 88 AD2d 556, 557)." *(Supra,* at 58-59.)

As *Graham* makes clear, in evaluating such encounters, a more important consideration than whether a particular type of drug packaging is labelled a "hallmark" (*see, e.g., People v Bonilla*, 199 AD2d 519, 520, *lv denied* 83 NY2d 802 ["foil packets as the hallmark of illicit drug activity"]) of drug activity or simply a "telltale sign" (*see, e.g., People v Balas*, 104 AD2d 1039, 1040 ["foil packet in which cocaine is commonly packaged * * * can be considered a telltale sign, if not the hallmark, of an illicit drug exchange"]) is in what context the packaging was observed and what were the other circumstances and known information. Thus, for example, if one were to see individuals holding tinfoil packets as they exit a school bake sale it would be a wholly different matter than the one at bar, where, in our view, the totality of the circumstances provided the experienced undercover detective with the requisite probable cause to arrest. Common sense need not be jettisoned nor credulity stretched to its outermost bounds in making such an assessment.

Here, the totality of the circumstances indicates that there was probable cause to arrest defendant for possession of narcotics. An undercover detective, trained and experienced in narcotics trafficking, saw defendant and his friend enter a building which was specifically under observation because of its known association with drug activity. When they exited, each was seen holding a small tinfoil packet of the type which the undercover detective knew, based on his experience, usually contains illegal drugs. Here, the tinfoil packets were, even absent evidence of their being exchanged for money, under the totality of the circumstances, a "hallmark" of drug-related activity (*see, People v Graham*, 211 AD2d 55, 58, *supra* ["(If the officer) had observed vials, glassine envelopes, tinfoil packets or any other type of package commonly associated with a drug transaction (being exchanged for money), probable cause would have existed"]).

The police officer's probable cause to believe that defendant possessed drugs was further strengthened by the fact that defendant and Deighan spent only a short period of time inside the building and were seen comparing their tinfoil packets before placing them in their jacket pockets. There are few, if any, reasonably innocent explanations for this conduct, and

when viewed through the prism of the undercover officer's experience and training, it was certainly more probable than not that a crime had taken place (*see, People v Carrasquillo*, 54 NY2d 248, 254). While the bake sale scenario was possible, it was certainly not probable. As was reiterated in *Graham*, because the dictates of the Federal Constitution's Fourth Amendment and its corollary in the State Constitution "are 'practical and not abstract', they must be interpreted 'in a commonsense and realistic fashion.' (*United States v Ventresca*, 380 US 102, 108.)" (*People v Graham*, 211 AD2d 55, 58, *supra.*) Realistically and commonsensibly evaluated, the defendant's conduct would lead a layperson, let alone a trained and experienced drug enforcement officer, to believe that an illegal drug transaction had just transpired and that defendant and Deighan now possessed illegal drugs.

The fact that the detective did not see an exchange or transfer of the tinfoil packets did not diminish the probability that defendant was guilty of narcotics possession (*see, People v Eldridge*, 103 AD2d 470, 474 ["The existence of probable cause in a narcotics possession arrest cannot be made to turn on an observation of the passing of glassine envelopes or money since none of the possession crimes requires such conduct as an element of the offense"]). The real issue was whether the detective reasonably believed that the tinfoil packets contained illicit narcotics rather than an innocuous substance (*see, People v Greenridge*, 131 AD2d 303, 304). Under the totality of these circumstances, the conclusion of an experienced undercover detective that defendant had just purchased drugs was reasonable and provided a sufficient basis to support probable cause.

Probable cause is, of course, the requisite predicate for an arrest and incidental search. Because the undercover detective possessed probable cause to believe that defendant possessed an illegal drug, the hearing court erred in concluding that, upon these facts, the police were merely permitted to make inquiry of him and we therefore reverse and remand for further proceedings.

Accordingly, the order of the Supreme Court, New York County (Patricia Anne Williams, J.), entered on or about September 15, 1993, granting defendant's motion to suppress a tinfoil packet of cocaine found on his person, should be reversed, on the law and the facts, and the matter remanded for further proceedings on the indictment.

ELLERIN, J. P., RUBIN, NARDELLI and TOM, JJ., concur.

Order, Supreme Court, New York County, entered on or about September 15, 1993, which granted defendant's motion to suppress, reversed, on the law and the facts, and the matter remanded for further proceedings on the indictment.