OPINION OF THE COURT
Lewis Bart Stone, J.
A Dunaway /Mapp /Huntley hearing was held before me on February 13, 2001. Police Officer George Engels testified and I find him credible.
Findings of Fact
In the early morning hours of August 7, 2000, Officer Engels and his partner were on patrol in uniform in a marked patrol car in the vicinity of 10th Avenue and 26th Street. Engels testified that he had been a member of the New York City Police Department for four years and had made approximately 10 arrests involving cocaine or marijuana, had received training with respect to narcotics and marijuana at the police academy, and been involved in over 100 arrests. Officer Engels also testified that he considered “interaction with criminals” as part of his training on the subject of narcotics, and that he had been involved with hundreds of suspects who were under the influence of alcohol or marijuana. Specifically, Officer Engels testified that he had seen “loose tobacco” in piles in stairwells, on sidewalks, and most commonly alongside glassine envelopes, and based upon these experiences as a police officer, he had learned that the presence of loose tobacco was a result of an individual emptying out a “Philly Blunt” cigar and refilling it with marijuana and/or cocaine.
At approximately 4:00 a.m. on August 7, while in the patrol car, Officer Engels observed the defendant standing next to a parked automobile. The car was parked on the parking apron in front of a closed auto repair shop. Officer Engels testified that this location is in the vicinity of a nightclub called “The Tunnel.” Officer Engels testified that the neighborhood near this club, specifically 10th Avenue and 26th Street, is patrolled more heavily because “there are a lot of problems that stem from that nightclub.” As Officer Engels stopped at a red light, he saw the defendant standing outside the open driver’s door, throwing garbage over his shoulder which landed several feet behind him. Officer Engels also observed a passenger in the front seat of the car.
*312 Officer Engels pulled his patrol car into the lot behind the defendant’s vehicle and approached the defendant. The defendant apologized for throwing the trash and began picking it up. Officer Engels asked the defendant for his license, registration and insurance. The officer asked the defendant whose car it was and the defendant responded that it was his car. The defendant then gave the officer a New Jersey license which had the name Joseph Cook and which bore a photograph of the defendant. Officer Engels observed that the defendant had glassy eyes, was unsteady on his feet, had trouble responding to the officer’s questions, and had slurred speech. The passenger of the car had exited the car and began yelling at the officer.
While still standing outside the defendant’s car, Officer Engels looked inside the open driver’s side door of the car and saw loose tobacco strewn on the front passenger seat and on the center console between the two front bucket seats. Officer Engels asked the defendant if he could search the car and defendant stated no. The officer entered the car, opened the center console, and found four bags of marijuana and one bag of cocaine. The officer did not search any other part of the car. The defendant and the passenger were then placed under arrest. The officer asked the defendant if the drugs belonged to him to which the defendant answered no, continued to deny that the drugs were his, and also stated that the other person should be placed under arrest.*
The defendant and the passenger were taken to the precinct for processing. As Officer Engels was searching the defendant, defendant repeatedly stated to the officer that he wanted to talk to him. The officer told the defendant it was “too late” whereupon the defendant stated that the drugs belonged to him and that they didn’t belong to the other person in the car.
The officer recovered another driver’s license during the arrest processing search of the defendant. Defendant had a second New Jersey license with the defendant’s photograph and the name of Brock Mays. Officer Engels stated to the defendant “to be straight with me” and that “there was an additional charge to lie.” The defendant stated that the first license bearing the name of Joseph Cook was the correct one. Officer Engels testified that “it didn’t add up” and asked the defendant his date of birth and addresses, but that the defendant “wasn’t answering straight.” Defendant then stated to the *313 officer that the first license with the name Cook was not his. Defendant then told the officer that he had gone to New Jersey Motor Vehicles with his cousin’s information and obtained that license.
The defendant was then processed through Central Booking and brought to the District Attorney’s Office at 100 Centre Street. At approximately 2:00 p.m. the same day, the defendant was read his Miranda warnings by the Assistant District Attorney to which the defendant answered yes after each question. Defendant made written and oral statements to the officer and the Assistant District Attorney regarding the drugs, the licenses, and the other man in the car.
Conclusions of Law
The primary issue in this case is whether the police had probable cause to search the car and arrest the defendant. In deciding whether the actions taken by the police in encounters with the citizenry are reasonable, the court must consider whether the police activity was both “justified in its inception and * * * reasonably related in scope” and intensity to the circumstances that provoked the encounter. (People v De Bour, 40 NY2d 210, 215 [1976].)
To guide this court’s analysis, the Court of Appeals has enunciated the following criteria:
“The minimal intrusion of approaching to request information is permissible when there is some objective credible reason for that inference not necessarily indicative of criminality (People v De Bour, supra). The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure * * * Where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person * * * A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3). Finally, a police officer may arrest *314 and take into custody a person when he has probable cause to believe that person has committed a crime, or offense in his presence (CPL 140.10).” (People v De Bour, 40 NY2d at 223.)
Defendant argues that defendant’s behavior and the subsequent observations of the tobacco-pile in the car are insufficient to establish probable cause for the police officer to search the car. The standard for probable cause justifying a search or seizure is not the same as that to establish guilt. Probable cause is defined as the body of information available to a police officer “which would lead a reasonable person who possesses the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed.” (People v McRay, 51 NY2d 594, 60.2 [1980]; People v Graham, 211 AD2d 55 [1st Dept 1995].) Since the Fourth Amendment’s commands are “practical and not abstract,” they must be interpreted “in a commonsense and realistic fashion.” (United States v Ventresca, 380 US 102, 108 [1965]; People v Graham, supra at 58; People v Cabot, 88 AD2d 556 [1st Dept 1982].)
Battlefield experience gained from the war on drugs has prompted the courts to change their view on what constitutes probable cause. The jurisprudence in the area of observations of street drug transactions, for example, “has moved beyond such niceties as distinctions based on the color or degree of opacity of the envelope to the point where the visual identification of the object exchanged for money is merely one element in the totality of the circumstances to be considered in any probable cause assessment.” (People v Graham, supra at 59, quoting People v Shaw, 193 AD2d 390 [1st Dept 1993] [internal quotation marks omitted].) The courts have applied evolving tests to determine the “hallmark” of a drug transaction. A glassine envelope went from a mere “telltale sign of heroin” to the “hallmark of an illicit drug exchange.” (People v McRay, supra at 604 [internal quotation marks omitted].) Similarly, the tinfoil packet was soon recognized as the cocaine analogy of the glassine. (People v Balas, 104 AD2d 1039 [2d Dept].) In the mid-1980’s, with the advent of crack/cocaine, the plastic vial joined the glassine envelope and tinfoil packet as a hallmark of drug activity. (People v Thomas, 227 AD2d 351 [1st Dept 1996]; People v Cummings, 194 AD2d 418 [1st Dept 1993].) Over these two decades of increased drug trafficking, the courts realized that they cannot operate “in a vacuum” and cannot ignore developing modes and techniques of drug trafficking and use.
For the court to analyze the street encounters and apply the “fluid concept” of probable cause necessary in the drug trade, *315 this court must increasingly rely on an officer’s expertise in narcotics cases as well as the nature of certain neighborhoods and changing trends in marijuana and narcotics use and sale. (Illinois v Gates, 462 US 213 [1983].) In the 1980’s, the courts focused on three factors they felt were relevant in determining probable cause: the “hallmark” or telltale sign of a drug-prone area, and the officer’s expertise; later, the courts added the aspect of the container to determine probable cause. More recent case law holds that in a probable cause analysis, the emphasis should not be narrowly focused on a recognizable drug package or any other single factor, but on an evaluation of the totality of the circumstances, which takes into account the realities of everyday life unfolding before a trained officer. (People v Hoover, 236 AD2d 626 [2d Dept 1997]; People v Alexander, 218 AD2d 284 [1st Dept 1996]; People v Graham, supra at 58-59; People v Cabot, supra.)
In this case, the initial encounter by the police with the defendant was proper. The observation of the defendant’s car in the parking apron in front of a closed auto repair shop at 4:00 a.m., where no car should have been, coupled with the defendant throwing garbage on the street gave the police the common-law right to inquire. In fact, the right of the police to approach a stationary or parked car is analogous to the right to approach a citizen on the street to request information under the first level of the four-tier analysis of De Bour. The officer’s request for information from the defendant here, like the request for information from a citizen on the street, is a minimal intrusion on the individual’s right to privacy. There was no restraint on the defendant’s freedom at that point, nor had his movement been significantly interrupted. Officer Engels possessed an objective and credible reason for approaching the defendant and making inquiry after his initial observations and at that point did not need to have any indicia of criminality. (People v Ocasio, 85 NY2d 982 [1995]; People v Harrison, 57 NY2d 470 [1982].)
Officer Engels’ request for the license, registration and other papers was proper inquiry based on his initial observations combined with the subsequent observations that the defendant was unsteady on his feet, had glassy eyes and slurred his speech. The officer also testified that this lot and shop were located near a club called “The Tunnel”; the officer stated that the area required increased patrol because it was “a problem.” While a more amplified record would have been preferable, this court recognizes and may even take notice that the com *316 mon “problem” associated with The Tunnel, a club notorious in New York, is excessive drug use as well as other antisocial activity. Therefore, Officer Engels’ knowledge of the area combined with the defendant’s inebriated or high condition elevated the officer’s suspicion and gave him the right to inquire, a “level 2” inquiry. Therefore, it was proper for the officer to request identification from the defendant.
Furthermore, no search occurred when Officer Engels looked into the interior of the car. (People v Class, 63 NY2d 491 [1984].) Police officers may look through car windows. The purpose of the officer’s action is irrelevant as to whether his gaze was by accident or decision, the conduct does not constitute a search. (People v Manganaro, 176 AD2d 354 [2d Dept 1991].) The pile of loose tobacco inside the car seen by the officer, combined with all the other factors, gave the officer reasonable grounds to believe that a crime had been committed, and a “level 3” detention and a forcible stop was therefore authorized.
While there are no direct cases regarding piles of tobacco, the court finds that the “fluid concept” of totality of the circumstances in establishing probable cause allows tins court to recognize these as indicia of drug activity as it is now carried out. The indicia of drug activity recognized by the courts is ever evolving, and is based on the actual practices of drug trade and consumption as they too evolve. (See People v Robinson, 265 AD2d 812 [4th Dept 1999] [officer’s observation of defendant throwing blunt to the ground and smell of burning marijuana gave police authority to seize blunt and arrest defendant]; Matter of Javier N., 226 AD2d 178 [1st Dept 1996] [rolling marijuana in brown paper approximately four inches long, one-half-inch wide and cylindrical in shape justified arrest and seizure]; see Matter of Camille H., 215 AD2d 143 [1st Dept 1995] [use of cigar-shaped “blunt” for smoking marijuana and the officer’s knowledge sufficient probable cause for possession of marijuana]; People v Barnes, 149 AD2d 359 [1st Dept 1989] [distinctly shaped-rolled cigarettes in defendant’s hand and furtive attempts to hide it, combined with distinctive smell of marijuana, provided probable cause]; People v Chestnut, 43 AD2d 260 [3d Dept 1974] [smell of marijuana alone inside car is sufficient to provide probable cause and search the occupants and the car].) To the past indicia can now be added small piles of loose tobacco, reflecting a new consumption pattern involving the use of a hollowed-out cheap cigar. (The Philly Blunt is a popular cheap cigar.) Officer Engels’ subsequent search of the *317 console’s interior was based upon probable cause and was therefore proper.
Defendant was placed under arrest and taken to the precinct for processing. Defendant stated that he wanted to speak to the police. Officer Engels responded that it was “too late,” but defendant, unprompted, stated to the officer that the drugs were his and not the other person’s. Although the defendant was in custody, these statements were spontaneous and not the subject of custodial interrogation and are admissible.
Once at the precinct, the police had the authority to search the defendant incident to a lawful arrest. (People v Gokey, 60 NY2d 309 [1983].) When the officer found the second license with defendant’s photograph but a different name, the defendant was in custody but had not been given any Miranda warnings. The officer stated to defendant that “it was an additional charge to lie,” and told the defendant “to be straight with [him].” The defendant first responded that the Joseph Cook license was his. The officer testified that “it didn’t add up” so he asked more questions about dates of birth and addresses and “he wasn’t answering straight.” The defendant finally stated that the Cook license was not his and told the officer that he went to New Jersey Motor Vehicles with his cousin’s information.
The court finds the statements admissible. Pedigree information is a recognized exception to restriction on inquiry. It is also essential, after arrest, for the police to be able to properly complete their administrative duties. The search which turned up the second license, as a search incident to an arrest, was also proper. This left the officer with an obvious facial problem: two licenses with two names and both having the picture of the defendant. Once confronted with two different pieces of identification and names, to ascertain which was the defendant’s true name, and pointing out the discrepancy of the two licenses, was a natural explanation as to why a new inquiry was being made. The fact that the defendant incriminated himself as a result does not make the pedigree question “interrogation.” (People v Rodney, 85 NY2d 289 [1995].) As explained by the Court of Appeals in Rodney, “the reason for the pedigree exception derives from the essential purpose of Miranda — to protect defendants from self-incrimination in response to questions posed as part of an investigation of a crime, as distinguished from noninvestigative inquiries.” (People v Robles, 180 Misc 2d 512, 524 [Crim Ct, Bronx County 1999] [internal quotation marks omitted], quoting People v Rodney.) *318 Like a defendant who is asked a pedigree question, the defendant here was asked a question, namely, what was his name. The purpose was not to elicit verbal information about a crime in order to further a police investigation into defendant’s conduct but to comply with the administrative police requirements of having a correct name of a person arrested. At the time of the inquiries, in fact, the defendant was being charged with controlled substance charges; when confronted with conflicting pieces of identification, it was only proper for the police to make further inquiries.
The court finds that the defendant was subsequently given Miranda warnings and waived his rights. Although the defendant had been improperly questioned about the drugs at the earlier street encounter, the court finds the subsequent questioning was sufficiently attenuated to make post-Miranda statements admissible. (People v Rodriguez, 231 AD2d 477 [1st Dept 1996].) These post-Miranda statements followed a “definite, pronounced break” in defendant’s interrogation such that defendant was no longer under the influence of prior questioning. (Rodriguez at 478 [internal quotation marks omitted]; People v Vorvolakos, 243 AD2d 286 [1st Dept 1997].)
Therefore, defendant’s motion is denied in its entirety.

 The People are not seeking to introduce this statement.